**Charles Anthony BOYD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69993.**

Court of Criminal Appeals of Texas, En Banc.

May 8, 1991.

Rehearing Overruled July 3, 1991.

Gary A. Udashen, on appeal only, Dallas, for appellant.

John Vance, Dist. Atty., and K. Drew, K. Chapman and D. Hagood, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

BAIRD, Judge.

A jury convicted appellant of capital murder pursuant to Tex.Penal Code Ann. § 19.-03(a)(2). The jury answered the three special issues in the affirmative and appellant was sentenced to death. Tex.Code Crim. Proc.Ann. art. 37.071. Appellant raises

twenty five points of error. We will affirm appellant's conviction and sentence.

Appellant does not challenge the sufficiency of the evidence. Therefore, we will only briefly address the facts of this case. On the day of the offense, the deceased's roommate returned home from work and discovered the deceased's nude, strangled body face up under water in the bathtub. Items were missing from the apartment, and the deceased's car was missing from the apartment's parking lot. Medical testimony reflected that the deceased was manually strangled to a point of unconsciousness or semi-consciousness and then placed into a bathtub containing water.

Appellant, who resided in the same apartment complex as the deceased, ultimately confessed to this offense.[1] Furthermore, police investigation determined that appellant had pawned the deceased's watch, and had sold other items belonging to the deceased.

Forensic testimony suggested the presence of seminal fluid in the deceased's vagina and anus. Blood and saliva tests established that appellant had a genetic marker carried by approximately 32.5 percent of the population. While this marker was absent from the deceased's blood sample, the marker was detected in fluids found on the deceased's bed sheet. Two hairs "foreign" to the deceased, yet found on the deceased's bed sheets, were consistent with appellant's hair.

At the punishment phase, the State introduced evidence of appellant's prior convictions of burglary and aggravated sexual assault. The State also introduced evidence of appellant's involvement in the killings of two other women who were found dead in their respective bathtubs, including his confessions to the crimes. Appellant's former co-worker testified that appellant choked and raped her. A representative of the Dallas County Sheriff's Department testified that appellant was disruptive while in jail.

The defense introduced evidence that appellant was known by friends and family to behave in a respectful, proper manner. Appellant's girlfriend testified that appellant has fathered a child which, due to appellant's incarceration, he has not seen. Appellant's mother testified that appellant was a good and caring child who tended to his mother when she broke her ankle. She stated that appellant's father died when appellant was six years old, but that she remarried and appellant and her other children went to church. She described appellant as marginally literate, a poor performer in school, and one who suffered from allergies as a child.

## I.

## THE TEXAS DEATH PENALTY STATUTE

### A.

### Mitigating Evidence

Appellant's first point of error contends that the trial court erred by not instructing the jury concerning mitigating evidence. His second point submits that the Texas capital murder punishment statute, Tex. Code Crim.Proc.Ann. art. 37.071, is unconstitutional as applied in his case because it does not provide for consideration of mitigating factors. Appellant acknowledges that there were no corresponding objections raised at trial, and that no specific instructions were requested at trial.

■ Appellant filed a pro se brief, wherein he claims that counsel was ineffective for failing to attack the constitutionality of Tex.Code Crim.Proc.Ann. art. 37.071. While the general rule is that appellant has no absolute right to hybrid representation, *Scarborough v. State*, 777 S.W.2d 83, 92 (Tex.Cr.App.1989), in the interest of justice we will address this pro se contention and

---

1. Appellant and another male were initially questioned by the police investigating the scene of the crime. The police asked appellant if he would be willing to go downtown to police headquarters, and appellant agreed to do so.

Thereafter, appellant was fingerprinted, and gave saliva, blood and hair samples to the authorities. He later gave a written statement confessing to the offense.

points of error one and two as raised by appellate counsel.

■ To support a claim of ineffective assistance of counsel, appellant must prove: 1) that counsel's performance was deficient and 2) this deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex.Cr.App.1986).[2] Absent both showings, we cannot conclude that a defendant's conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Moreover, if a defendant fails to prove the prejudice component (the second prong), the court need not address the question of counsel's performance. *Id.*, 466 U.S. at 697, 104 S.Ct. at 2070. We will turn our attention to the second prong and determine whether appellant was harmed when counsel did not object to the trial court's failure to instruct the jury concerning mitigating evidence. If appellant was not harmed, then he has not been prejudiced and there is no error under *Strickland* and there is no merit to the contentions raised in appellate counsel's points of error one and two.

Article 37.071 Tex.Code Crim.Proc.Ann. sets forth the current scheme under which the State seeks a sentence of death for capital murder convictions. Pursuant to the statute, the jury is to determine three special issues at the punishment phase of trial:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response

to the provocation, if any, by the deceased.

Tex.Code Crim.Proc.Ann. art. 37.071(b)

If the jury unanimously answers "yes" to each special issue, the trial court must sentence the defendant to death; otherwise, the defendant is sentenced to life imprisonment. Tex.Code Crim.Proc.Ann. art. 37.-071(c).

This statute was enacted in the wake of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), wherein the United States Supreme Court held that then current death penalty statutes (including Texas's) violated the Eighth and Fourteenth Amendments due to the arbitrary and capricious manner in which those statutes were applied. The revamped Texas statute narrowed the class of death eligible offenses, see Tex.Penal Code Ann. § 19.03, and guided the jury's discretion in the imposition of the death sentence by requiring the jury to answer the three special issues pursuant to Tex.Code Crim.Proc.Ann. art. 37.071(b).

After being adjudged constitutionally sound by this Court in *Jurek v. State*, 522 S.W.2d 934 (1975), the statutory scheme passed constitutional muster in the United States Supreme Court, because the "procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a death sentence." *Jurek v. Texas*, 428 U.S. 262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976).

Subsequent to *Jurek*, the Supreme Court continued to address the Eighth Amendment requirement of individualized assessment in the death penalty process. In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court emphasized that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant

---

2. For error in the punishment phase of noncapital trials, the appropriate standard for review is that of "reasonably effective assistance of counsel." *Ex parte Cruz*, 739 S.W.2d 53 (Tex.Cr.App.1987).

proffers as a basis for a sentence less than death." *Id.*, at 604, 98 S.Ct. at 2964.

Likewise, in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court reversed a sentence of death where Oklahoma's death penalty statute provided for the introduction of mitigating evidence but where the sentencing judge concluded, as a matter of law, that he was unable to consider the proffered evidence of the youthful defendant's troubled childhood and emotional turmoil. Extending the *Lockett* rationale, the Court held that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.*, 455 U.S. at 113–114, 102 S.Ct. at 876.

The Supreme Court's focus on the jury's ability to consider and give *effect* to mitigating evidence in the death penalty context, as articulated in *Lockett*, 438 U.S. 586, 98 S.Ct. 2954, and *Eddings*, 455 U.S. 104, 102 S.Ct. 869, was applied to the Tex. Code Crim.Proc.Ann. art. 37.071 in *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). Therein, a plurality of the Supreme Court determined that Franklin was *not* sentenced to death in violation of the Eighth Amendment because the jury was free to give effect to his mitigating evidence of good behavior in prison by answering "no" to the second special issue. *Id.*, 487 U.S. at 179–80, 108 S.Ct. at 2330 (emphasis added).

The five concurring and dissenting members of the Court suggested that Tex.Code Crim.Proc.Ann. art. 37.071(b) may not survive a constitutional challenge to a different fact scenario. Justice O'Connor, in concurrence, determined that Franklin's evidence of good prison behavior had no relevance beyond the second special issue, but noted that if Franklin:

> had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its 'reasoned moral response' to that evidence. If this were such a case, then we could have to decide whether the jury's inability to give effect to that evidence amounted to an Eighth Amendment violation.

*Id.*, 487 U.S. at 185, 108 S.Ct. at 2333 (O'Connor, J., joined by Blackmun, J., concurring).

Justice O'Connor's observations came to light, the following term, in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), wherein the Supreme Court held that the Texas death penalty scheme failed to provide a method by which the sentencer could give *effect* to Penry's mitigating evidence of mental retardation and severe childhood abuse.[3] The Court focused on how, under the facts of Penry's case, the undefined first special issue concerning deliberateness failed to guarantee a mechanism for a "reasoned moral response" to the mitigating evidence of severe mental retardation.[4]

---

**3.** Testimony indicated that Penry had "organic brain damage," which was probably caused by trauma to the brain at birth. He was diagnosed as having the mental age of a 6½ year old. Penry never finished the first grade. His mother routinely beat him over the head with a belt when he was a child. Penry was also routinely locked in his room without access to a toilet for long periods of time. Penry spent much of his childhood in State institutions. Experts for both the State and the defense agreed that Penry was a person of extremely limited mental ability, and that he seemed unable to learn from his mistakes. *Penry*, 492 U.S. at 308–09, 109 S.Ct. at 2941–42.

**4.** Specifically, the Court held "[i]n the absence of jury instructions defining 'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue. Without such a special instruction, a juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime 'deliberately.'" *Penry*, 492 U.S. at 323, 109 S.Ct. at 2949.

In analyzing the second special issue on future dangerousness, the Supreme Court noted that Penry's mental retardation is relevant to that issue, but further recognized that such evidence is relevant only as an aggravating factor and not as a mitigating factor. The Supreme Court concluded that the second special issue did not provide a vehicle for the jury to give mitigating effect to Penry's evidence of mental retardation and childhood abuse. *Penry*, 492 U.S. at 323–24, 109 S.Ct. at 2949.

The Supreme Court also held that the third special issue, regarding provocation, failed to provide a manner in which a sentencer could express a determination that Penry lacked the moral culpability to be sentenced to death. *Id.*, 492 U.S. at 324–25, 109 S.Ct. at 2950. The Court noted that in order to ensure reliability that a sentence of death is appropriate punishment, the sentencer must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or circumstances of the crime. *Id.*, 492 U.S. at 328–29, 109 S.Ct. at 2952.

The Court concluded that in Penry's case, *"in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." Ibid.* (Emphasis supplied.)

Turning now to the case at bar, we focus upon the constitutionality of Tex.Code Crim.Proc.Ann. art. 37.071 as applied to appellant's case due to the court's failure to instruct the jury concerning mitigating evidence, and the statute's failure to otherwise provide for consideration of mitigating factors. Appellate counsel cites to the following as evidence of mitigation:

1) his employer testified that appellant was a good worker and was promoted in his janitorial job,

2) appellant's girlfriend testified that appellant looked as if he had been crying when he was at the police station,

3) appellant's barber, a woman who knew appellant all his life, testified that he was always polite, nice and helpful,

4) the pastor to appellant's family testified that he had known appellant for ten years and that appellant always behaved in a respectful manner,

5) appellant's sister testified that appellant helped her with her asthma when she was a child,

6) a female friend of appellant's girlfriend testified that appellant treated his girlfriend and her child with consideration,

7) appellant's girlfriend testified that appellant treated her child well, and

8) appellant's mother testified that appellant's father died when he was six years old, that she remarried, and that he was a good child who took care of her when she hurt her ankle.[5]

Appellant argues that absent additional instructions there was no opportunity for the jury to give independent mitigating weight to his evidence. We disagree. The mitigating evidence presented in the case at bar has no significance independent of its relevance to the second special issue.

Appellant's evidence is much like that presented in *Franklin*, 487 U.S. at 179–80, 108 S.Ct. at 2330, wherein petitioner contended that evidence of a good prison disciplinary record reflected so positively on his character that additional instructions were required to provide the jury with a vehicle through which to impose a life sentence. The Supreme Court disagreed with Franklin's argument, holding that the second special issue adequately encompassed the character evidence presented in that case. But nothing in our cases supports petitioner's contention that relevant aspects of his "character," as far as they were

---

5. Appellant's pro se brief fails to specifically set forth the evidence of mitigation. After thoroughly reviewing the record, we cannot ascertain any conceivable mitigating evidence not set out above.

illuminated by the presentation of evidence concerning petitioner's disciplinary record, encompassed anything more than those matters fully considered by the jury when it was asked to answer the second Special Issue.

*Franklin*, 487 U.S. at 178, 108 S.Ct. at 2329.

As Justice O'Connor noted in her concurring opinion:

> To the extent that the mitigating evidence introduced by petitioner was relevant to one of the special verdict questions, the jury was free to give effect to that evidence by returning a negative answer to that question.

*Id.*, 487 U.S. at 185, 108 S.Ct. at 2333 (O'Connor, J., joined by Blackmun, J., concurring).

Appellant's case is unlike *Penry*, 492 U.S. 302, 109 S.Ct. 2934, which addressed Penry's mental retardation and abusive childhood. Penry's mitigating evidence operated as a "two edged sword" giving it relevance beyond the scope of the special issues. Rather, appellant's evidence is much like that in *Franklin* which possessed such "limited probative value" that it failed to demonstrate positive character traits that might mitigate against the death penalty such as evidence of "voluntary service, kindness to others or of religious devotion" as discussed by Justice O'Connor. *Franklin*, 487 U.S. at 186, 108 S.Ct. at 2333 (O'Connor, J., joined by Blackmun, J., concurring). Appellant's evidence, which does not rise to the level of anything more than common courtesy, was given full effect within the second special issue.[6] To hold otherwise would be tantamount to declaring the capital sentencing scheme facially unconstitutional. The Texas capital sentencing scheme was held to be constitutional in *Jurek*. The Supreme Court specif-

ically declined to declare the scheme unconstitutional in *Franklin* and *Penry*. Today, we decline the implied invitation of appellant to overrule established Supreme Court precedent.

We conclude that appellant was not deprived of effective assistance of counsel because he was not prejudiced by trial counsel's failure to request additional limiting instructions. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2070. Simply put, there was no error attendant to the omission of additional instructions. The claims of ineffective assistance of counsel raised in appellant's pro se brief are overruled. Our disposition of this issue renders unnecessary further review of appellant's first and second points of error raised by appellate counsel. Appellant's first and second points of error are, therefore, overruled.

### B.

#### Defining "Deliberately"

■ Appellant's third point of error complains that the trial court erred in not defining the term "deliberately." In *King v. State*, 553 S.W.2d 105, 107 (Tex.Cr.App. 1977), the defendant argued that the trial court committed reversible error "by failing, after timely request, to define ... deliberately; probability; criminal acts of violence; continuing threat to society." We held that trial courts need not provide special definitions for these terms in its charge to the jury during the punishment stage of a capital murder trial. In *Fearance v. State*, 771 S.W.2d 486 (Tex.Cr.App.1988), we again undertook the issue of whether a defendant, upon timely request, was entitled to a definition of the term deliberately. We again concluded that the requested instructions on deliberateness were not necessary. *Id.*[7]

---

6. Additionally, the only evidence which arguably could be categorized as anything other than the insignificant character evidence stated above is limited to the fact that appellant's father died when appellant was a six year old boy. However, the record reflects that appellant's mother remarried, appellant was raised with his siblings and the family regularly attended church.

7. This case does not present us with a situation wherein a special definition of the term deliberate might present the jury with the opportunity to express its "reasoned moral response" to mitigating evidence like that contemplated by the Supreme Court in *Penry*, 492 U.S. at 324–25, 109 S.Ct. at 2950.

Appellant's third point of error is, therefore, overruled.

■ Appellant's fourth point of error contends that Tex.Code Crim.Proc.Ann. art. 37.071 is unconstitutionally vague for failure to define the term deliberately. We have repeatedly held that Tex.Code Crim. Proc.Ann. art. 37.071 is not unconstitutionally vague because words not statutorily defined are to be given their ordinary meaning. *Smith v. State*, 683 S.W.2d 393, 410–11 (Tex.Cr.App.1984); *Williams v. State*, 668 S.W.2d 692, 700 (Tex.Cr.App. 1983); *Granviel v. State*, 552 S.W.2d 107, 117 (Tex.Cr.App.1976). Therefore, appellant's fourth point of error is overruled.

### C.

### Defining "Criminal Acts of Violence"

Appellant's fifth and sixth points of error contend that the State's voir dire of veniremembers Carroll and Stewart that criminal acts of violence can include violence to property constitute reversible error.

Appellant failed to object to these exchanges for either prospective juror. Appellant did not challenge either prospective juror, and both were selected to serve on the jury.

■ In order to preserve a complaint for appellate review, a party must have registered a timely and specific objection. See Rule 52(a) Tex.R.App.Pro. Appellant's failure to object to this questioning waives review of the issues upon appeal. Cf. *Morrow v. State*, 753 S.W.2d 372 (Tex.Cr.App. 1988) (appellant objected "unfailingly" each time prosecutor asked improper hypotheticals). Appellant's fifth and sixth points of error are overruled.

■ Appellant's seventh point of error presents a related issue. Appellant contends that Tex.Code Crim.Proc.Ann. art. 37.071(b)(2) is unconstitutionally vague for failure to define the term "criminal acts of violence." [8] We have previously held that this term need not be defined. *Rector v. State*, 738 S.W.2d 235, 244 (Tex.Cr.App. 1986); *King*, 553 S.W.2d at 107. Finding no merit to appellant's seventh point of error, it is overruled.

### II.

### THE COURT'S CHARGE

■ Appellant's eighth point of error contends that the trial court erred in failing to place the burden of proof on the State to negate the voluntary manslaughter elements in the application paragraph on the capital murder charge. Appellant acknowledges that no objection was registered at trial, but submits that the error was fundamental, requiring a reversal under *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App. 1984) (fundamental error is one that is so egregious and created such harm that the defendant has not received a fair and impartial trial).

In *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Cr.App.1983), a majority of this Court held that in a murder prosecution where voluntary manslaughter is raised by the evidence, the charge must not only place the burden of proving a lack of sudden passion upon the prosecution, but must also place this burden in the application paragraph of the charge.[9] Appellant fails to cite this Court to any cases which extend the *Cobarrubio* rationale to the capital murder context, but invites this Court to do so.

The jury charge in the case at bar initially set forth the general definitions of capital murder, murder, voluntary manslaughter, burglary and robbery. In applying the law to the facts, the trial court instructed

---

**8.** Appellant's argument concerns Tex.Code Crim.Proc.Ann. art. 37.071(b)(2) where the sentencer must determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" before a sentence of death can be imposed.

**9.** Tex.Penal Code Ann. § 19.04(a) provides:
A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this Code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

the jury on capital murder, murder and voluntary manslaughter.

A review of the record, however, reveals that appellant was not entitled to a charge on voluntary manslaughter, for there was no evidence of sudden passion in the case at bar. *Lincecum v. State*, 736 S.W.2d 673 (Tex.Cr.App.1987).[10] Accordingly, we decline appellant's invitation to extend *Cobarrubio* to the capital murder context presented in the case at bar. Appellant's eighth point of error is overruled.

■ In his ninth point of error, appellant claims that the trial court erred in overruling his objection to the jury charge at the guilt/innocence stage of trial based on a failure to apply the law to the facts on the burglary allegations.

The application paragraph is as follows: Before you would be warranted in convicting the defendant of capital murder, you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant was engaged in the commission or attempted commission of the felony offense of robbery of Mary Milligan, or in the commission or attempted commission of burglary of a habitation of which the deceased was the owner, as defined in this charge, but also that during the commission of the robbery or attempted commission thereof, if any, or during the commission of the burglary of a habitation or attempted commission thereof, if any, the defendant strangled Mary Milligan with his hands or strangled Mary Milligan with a means, the exact nature and description of which is unknown to the Grand Jurors, or drowned Mary Milligan in a bathtub containing water with the intention of thereby killing her. Unless you so find from the evidence beyond a reasonable doubt that the defendant, on said occasion specifically intended to kill the said Mary Milligan when he stran-

gled her with his hands or with a means, the exact nature an description of which is unknown to the Grand Jurors, if he did strangle her, or when he drowned her, if he did drown her, you cannot convict him of the offense of capital murder.

Prior case law reveals that appellant's claim is without merit. Appellant argues that it is conceivable under the evidence presented that the jury could have concluded that appellant entered the habitation with only the intent to commit the offense of murder. Even if this were true, appellant would not be entitled to further instructions. This Court has held that an unlawful entry into a habitation with the intent to commit murder will satisfy the burglary element of a capital murder charge. *Fearance v. State*, 771 S.W.2d 486 (Tex.Cr.App.1988). We have also applied that holding to a sufficiency challenge. *Beathard v. State*, 767 S.W.2d 423 (Tex.Cr.App.1989). Concluding that those cases are controlling, we hold that appellant's ninth point of error is overruled.

## III.

### VOIR DIRE

In point of error ten, appellant claims that the trial court erred in limiting the voir dire of veniremember Oswalt. The record reflects the following exchange between defense counsel and veniremember Oswalt:

[DEFENSE COUNSEL]: —And I know I've been talking a long time and I know I've been going all over the place. Is there anything I've talked about that you don't understand or what you wanted to ask me about?

PROSPECTIVE JUROR: *No.*

[DEFENSE COUNSEL]: Have I confused you in any way?

PROSPECTIVE JUROR: *No.* For a little bit, but I—

---

**10.** In fact, the only evidence which could arguably support voluntary manslaughter is found in appellant's confession which claims that the victim called him "some kind of name, 'you son of a bitch,'" after appellant "grabbed" the victim and forced her into her apartment. Appellant's confession states that this made him angry, and

he "grabbed her by the throat and dragged her into the bathroom" where he choked her before she "laid down in the bathtub" and he "turned the water on." The jury answered the third special issue affirmatively, concluding that appellant's response to the victim's provocation, if any, was unreasonable.

[DEFENSE COUNSEL]: Well, what did I confuse you about?

PROSPECTIVE JUROR: No, it was all straightened out. When we were going over the questions, but *I understood when I answered.*

[DEFENSE COUNSEL]: Pardon?

PROSPECTIVE JUROR: *I understand now.*

[DEFENSE COUNSEL]: Let me go back to Mr. Nichols and the cup.

THE COURT: You're out of time. You're out of time. You used forty-five minutes.[11]

It should be noted at the outset that the record is devoid of any indication that veniremember Oswalt was either confused or vacillating when the time limit expired. Defense counsel then exercised it's tenth peremptory strike upon veniremember Oswalt.

■ It is a well-established principle that the conduct of voir dire rests largely within the sound discretion of the trial court. *Mays v. State,* 726 S.W.2d 937 (Tex.Cr.App. 1986). While the right of the accused to question a veniremember freely and broadly is a right that should never be unnecessarily limited or restricted, trial courts may impose reasonable restrictions on the exercise of voir dire examination. *Faulder v. State,* 745 S.W.2d 327, 334 (Tex.Cr.App. 1987). The appropriate standard for re-

---

11. The voir dire of this witness continued as follows:

> [THE PROSECUTOR]: Judge, we won't object to [DEFENSE COUNSEL] repeating—
>
> THE COURT: You used all your time, too. You've got nothing to give him.
>
> [THE PROSECUTOR]: Judge, I tell you what. I'll give him minutes off my next witness. (Off-the-record conference at Defense counsel table).
>
> [DEFENSE COUNSEL]: Now, then, everybody's agreed I can do my cup trick.
>
> THE COURT: I didn't agree. You used your time. Forty-five minutes.
>
> [DEFENSE COUNSEL]: Oh. So, I can't ask the jury any more questions.
>
> [THE PROSECUTOR]: May we approach the bench just for a minute?
>
> THE COURT: You've used your time. There's got to be some limit to it. And the limit is forty-five minutes.
>
> [THE PROSECUTOR]: May we approach the bench?
>
> (Off the record conference.)
>
> THE COURT: Why don't you step down and go back in that reporter's office?
>
> [DEFENSE COUNSEL]: Your Honor, can we make an informal bill at this time?
>
> THE COURT: Let me have the juror step out. (Prospective juror excused from courtroom and following proceedings had outside presence and hearing of prospective juror.)
>
> THE COURT: Okay. You can make your bill.
>
> [DEFENSE COUNSEL]: Your Honor, we would object to the Court imposing time limits in regard to venireman Ms. Oswalt in that the Court has imposed an arbitrary time limit of forty-five minutes per side in regard to this. We would state that—And had we been allowed to continue with questioning Ms. Oswalt as we requested, we would have asked her in regard to confessions, we would have asked her in regard to corroboration of circumstantial evidence, we would have asked her questions in regard to the difference between intentionally and deliberately, we would have asked her questions in regard to probability, we would have asked her questions in regard to provocation, we would have also asked her questions in regard to the—whether she would have been able to talk in regard to foreseeable future, difference between probability and mere chance and further have gone into whether she would have been guided by her personal feelings, as well as the Court's charge in regard to all of these questions, as well as questions in general. We would ask that if her personal—whether her personal beliefs would take precedence over the Court's charge or the law, either/or in that regard, and whether the defendant in regard to continuing threat to society as to where and when the defendant would be a continuing threat to society.
>
> We would state that the Court foreclosing our questioning on any one of these matters is violative of our defendant's constitutional rights of valid assistance of counsel, due process, and an intelligent use of a peremptory challenge. All these questions were proper inquiry for the juror, and to arbitrarily decline, for us to be able to continue voir dire in regard to relevant areas we think is certainly violative of all our defendant's constitutional rights. We would object.
>
> THE COURT: Let the record show that the Court imposed a forty-five minute limit on each side at the beginning or close to the beginning of voir dire examination. Ms. Oswalt hit the stand at 9:05 this morning, questioned by the State until about 9:50, we took a ten minute break, and Mr. Brauchle began his questioning at 10:00 o'clock. He had forty-five minutes to ask any questions he wanted to ask. The Court didn't stop him from asking any question. I did stop him at 10:45, forty-five minutes after he began, and the Court will not permit any more questions.

view is whether the trial court abused its discretion. *Id.*

 Appellant cites *Smith v. State*, 703 S.W.2d 641 (Tex.Cr.App.1985), to support his contention that his rights to due process and due course of law, effective assistance of counsel and right to be free from cruel and unusual punishments under the United States and Texas Constitutions were violated. *Smith*, 703 S.W.2d 641, however, does not advance appellant's contention that the trial court abused its discretion. In *Smith*, 703 S.W.2d at 645, a murder prosecution where the entire defensive theory was insanity, the trial court erred in refusing to allow the defendant to voir dire the panel about materials they had read about the defense of insanity, their exposure to publicity about the instant case, and their thoughts about the purposes of punishment. In the case at bar, the trial court never limited the questions appellant could ask of veniremember Oswalt; instead, the trial court simply enforced a previously established time limit. Nothing in the record suggests that the trial court abused its discretion in setting time limits and enforcing them against defense counsel with respect to veniremember Oswalt. In fact, the record reflects that the subjects presented in counsel's bill were thoroughly covered in the voir dire of the veniremember. Duplicitous questions on voir dire may be limited to curb the prolixity of what can become the lengthiest part of a criminal proceeding. *Williams v. State*, 692 S.W.2d 671 (Tex.Cr. App.1984).

 We adhere to the proposition that the trial court can impose reasonable time limits for voir dire. *Clark v. State*, 608 S.W.2d 667, 669 (Tex.Cr.App.1980); *Abron v. State*, 523 S.W.2d 405, 408 (Tex.Cr.App. 1975). Under these circumstances, the trial court did not err in refusing to permit further questioning. *Mays*, 726 S.W.2d 937. Appellant's tenth point of error is overruled.

Appellant's eleventh and twelfth points of error complain that the trial court erred in limiting the voir dire of veniremembers Ahrens and Scott. Appellant relies on the same authority in his eleventh and twelfth points, and submits that the arguments supporting both claims are "identical." Therefore, we will consolidate these points of error for review.

With respect to veniremember Ahrens, the following exchange occurred:

[DEFENSE COUNSEL]: Texas law says that in most cases the Judge can give you an instruction about the law of parole. It's a very lengthy instruction, and I'm not even going to go into it, because it really doesn't even matter much. The important thing that matters is that it does not apply in capital murder cases. Judge Hampton will not give you an instruction on parole. He will mention parole in his jury charge on punishment, if we ever get to that stage. He will say, and I'm not really quoting, although it may sound like it, that any parole considerations, parole or clemency or commutation of sentence or anything like that is strictly up to the Board of Pardons and Paroles of the State of Texas. It is absolutely no concern of the jury's, and you've got to completely disregard that. Now, again, we don't live in a vacuum. You know that there is a parole law. If Judge Hampton instructs you, if you receive an instruction in the Court's charge to completely disregard any considerations of parole or commutation of sentence or clemency, will you be able to follow that instruction?

PROSPECTIVE JUROR: Yes, I would.

[DEFENSE COUNSEL]: All right. Now, like I say, we all know what death means. What does life—What does a sentence of life in the Texas Department of Corrections mean to you under the situation that we're in?

PROSPECTIVE JUROR: I believe it's ninety-nine years. I'm not sure the exact sentence, but he's going to be in prison the rest of his life, remaining life.

[DEFENSE COUNSEL]: All right. Is that what you will believe it to mean, and is that how you will consider it if you are chosen as a juror in this case.

[THE PROSECUTOR]: May we approach the bench, Judge?

(Off the record conference)

THE COURT: Okay, [DEFENSE COUNSEL].

[DEFENSE COUNSEL]: Thank you, Your Honor. You understand, sir, what I'm asking you, and you've already given me an answer. I'm going to explore it a little bit further with you—is what the effect—what you think the effect of a life sentence will be upon proper instruction by the Court I've already told you what the instruction is going to be—and—

[THE PROSECUTOR]: Judge, I'd object to that question. I think it's potentially misleading to this juror. It's really irrelevant as to what Mr. Ahrens thinks a life sentence means or doesn't mean. The issue is can he follow the parole charge that you'll give him, that is, "you won't consider it for any purpose." He's already answered yes.

THE COURT: Whether there's parole or not is not going to be a matter for you to think about at all, and, so, I'm going to sustain the objection, because I just don't think it's relevant in voir dire.

[DEFENSE COUNSEL]: Your Honor, we would respectfully request the Court to allow—Well, first of all, we would object to the limitation of the defendant's voir dire on the grounds that the defendant is not allowed to intelligently exercise his peremptory challenge—his peremptory challenges, nor is he being allowed to develop any possible grounds for a challenge for cause. Further, the defendant would specifically object to not being able to ask Mr. Ahrens, a potential juror in a capital murder case, whether he believes that life would mean that the defendant would be back on the street in the foreseeable future.

During the voir dire of veniremember Scott, the following exchange occurred as defense counsel questioned Scott regarding Scott's definition of "society":

[DEFENSE COUNSEL]: Would that society include prison society?

PROSPECTIVE JUROR: Would it include what, sir?

[DEFENSE COUNSEL]: Prison society?

PROSPECTIVE JUROR: It would include everybody, I guess, as far as I can see.

[DEFENSE COUNSEL]: All right. Can you see the problem that we're having, and that is after you find an individual guilty of capital murder, there are only two sentences possible. Death—Everybody knows what death means—and a life sentence in the Texas Department of Corrections.

And in order for any juror—And I'm not criticizing you, but in order for any juror to give meaning to the Court's instructions that you cannot consider parole, an individual can say, "Oh, no, I'm going to consider parole. You don't have to worry about that," and then turn around on Question No. 2 and say to himself, "Well, my definition of society is my friends and my neighborhood and my home." Right? An individual can say that.

PROSPECTIVE JUROR: He could, yes.

[DEFENSE COUNSEL]: But if one says that and if one makes a decision on the probability of future criminal acts that would constitute a threat to one's self, one's family, one's neighbors, one's community, you automatically infer that a life sentence in the Texas Department of Corrections doesn't mean life. Or else how could that individual get into your commune, into your home, into your society?

[THE PROSECUTOR]: Judge, this isn't voir diring. This is argument, and I would—

THE COURT: I think you ought to ask questions. I sustain that.

[DEFENSE COUNSEL]: Note our exception, Your Honor, and we would specifically object to the Court's limitation of a full voir dire on the—on this juror's definition of society and on the application of the parole laws.

THE COURT: Well, I've already explained you can ask him about what he thinks society is, and I think he answered the question.

[DEFENSE COUNSEL]: Yes, sir, he has given me an answer, but we would respectfully submit to the Court that we

need to inquire of this juror and we need to explain to the juror the effects of the parole law charge on his definition, if there would be an effect.

THE COURT: No, we're not going to go into the parole law charges. Sustain the objection to that.

With respect to veniremember Ahrens, appellant submits that he was attempting to determine if the juror would think that if appellant received a life sentence he would be released from prison at some point in time. Regarding veniremember Scott, appellant reasons that his inquiry into how parole would affect the juror's definition of society was a legitimate area of voir dire. The record reflects that appellant did not exercise a peremptory challenge on either Scott or Ahrens. Indeed, the record reflects that defense counsel agreed to take both jurors. Appellant cites the same cases in his eleventh and twelfth points, and submits that the arguments supporting both claims are "identical."

Appellant again cites *Smith,* 703 S.W.2d 641, to support his argument that the trial court abused its discretion. In *Smith,* 703 S.W.2d at 643, we reiterated the proposition that the trial court must not restrict proper questions which seek to discover a juror's views on an issue applicable to the case. See *Powell v. State,* 631 S.W.2d 169 (Tex.Cr.App.1982) (punishment philosophy is a proper question); *Clark v. State,* 608 S.W.2d 667 (Tex.Cr.App.1980) (conclusion about guilt or innocence is a proper area); *Smith v. State,* 513 S.W.2d 823 (Tex.Cr. App.1974) (bias against parts of the range of punishment is a proper matter); *Mathis v. State,* 167 Tex.Cr.R. 627, 322 S.W.2d 629 (1959) (juror's views relative to a defendant's defense is a proper question).

■ Upon reviewing the record in the case at bar, we are not persuaded that the questions appellant sought to ask were proper in the context presented during the

voir dire of each veniremember. Veniremember Ahrens stated that he could completely disregard parole, commutation or clemency, in accordance with the charge of the court. Appellant asked and received veniremember Ahrens' personal opinion about what a life sentence was ("I'm not sure the exact sentence, but he's going to be in prison the rest of his life, remaining life."). The trial court instructed veniremember Ahrens, "Whether there's parole or not is not going to be a matter for you to think about at all, and, so, I'm going to sustain the objection, because I just don't think it's relevant in voir dire." Given the context of the question posed, the trial court did not abuse its discretion in prohibiting further questions about veniremember Ahrens' personal opinions about what a life sentence meant.

■ Likewise, the trial court did not abuse its discretion in limiting the voir dire of veniremember Scott regarding how parole laws affected his personal definition of "society." Veniremember Scott was questioned extensively about his definition of society. The question appellant sought to ask was not directed toward whether the potential juror could follow the court's charge, but attempted to convince the veniremember that:

"if one makes a decision on the probability of future criminal acts that would constitute a threat to one's self, one's family, one's community, you automatically infer that a life sentence in the Texas Department of Corrections doesn't mean life. Or else how could that individual get into your commune, into your home, into your society?"

Appellant fails to cite any case law which supports this interpretation of the Texas capital sentencing scheme.[12] Nor does he cite us to any cases which hold that this specific question is proper in the voir dire context.[13] We hold that the trial court did

---

12. We have held that "in deciding whether to answer the second special issue in the negative the jury would clearly focus its attention on the 'society' that would exist for the defendant and *that* 'society' would be the 'society' that is within the Department of Corrections. *Rougeau v.*

*State,* 738 S.W.2d 651, 660 (Tex.Cr.App.1987) (emphasis in original).

13. Appellant's brief does recognize that, under *King v. State,* 631 S.W.2d 486 (Tex.Cr.App.1982),

not abuse its discretion in prohibiting appellant from asking this question of veniremember Scott. *Faulder*, 745 S.W.2d 327.

■ In his thirteenth point of error, appellant claims that the trial court erred in limiting his voir dire of veniremember Milnar regarding what factors he thought would influence him to vote for the death penalty. Appellant complains of the following:

[DEFENSE COUNSEL]: ... What I'm saying is that it's kind of hard for us to come down here and ask somebody what would it take for you to give the death penalty or what do you think is a death penalty case, when we're inside the criminal justice system on a day-to-day basis. We know in our own minds what we think may or may not be a death penalty case. What I'm basically asking you is what you as a layman think is a case that is proper for the death penalty to be imposed? Could you share that?

[THE PROSECUTOR]: Judge, that's the—you can't ask the juror to give facts which he thinks will, yeah, that's a death penalty and that's not a death penalty. He's asking the juror to commit himself to a fact situation. That's improper.

[DEFENSE COUNSEL]: I'm not asking him to commit himself to any facts. I'm asking him what factors he thinks, if they appeared in a case or not in a case, would be things that would influence him in voting his verdict.

THE COURT: What factors would influence him?

[THE PROSECUTOR]: If you peg it to those questions, that's one thing. But to ask a blanket statement like that, Judge, is improper. I have no objection at all if [DEFENSE COUNSEL] asks these questions with regards to Question No. 2, what factors would be helpful to you, because I think that's the same question we asked, and he's entitled to ask that.

THE COURT: You understand actually the jury doesn't vote death? They vote yes or no on each of those questions, and there are various factors that are incor-

porated in the question. You understand that?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: And you—I think the proper question is whether you would consider the evidence that's presented to you and conform your verdict to the evidence in each case. Could you do that?

PROSPECTIVE JUROR: I could.

THE COURT: Without regard to what the sentence might be?

PROSPECTIVE JUROR: Right.

[DEFENSE COUNSEL]: Was Mr. Hagood's objection sustained?

THE COURT: Yes, I'm going to sustain it. It has to be tied to the three questions that are going to be asked him.

[DEFENSE COUNSEL]: Any question that I ask that involves his voting for the death penalty has to be tied to these three question?

THE COURT: Yes, I'm not going to let you commit him as to what factor—I have no idea what you're referring to as to what factors might influence him to vote for death.

[DEFENSE COUNSEL]: I don't, either, but I can talk to him in regard to factors that he thinks are important in the case being a death penalty case or not so that I can properly execute or—execute my peremptory challenges.

THE COURT: The factors that are important are in those three questions, and you can ask about those.

[DEFENSE COUNSEL]: Well, the factors that are important to me and to my client are the factors that are in the man's mind as to what he thinks is a proper death penalty case, Your Honor.

THE COURT: I can't conceive of anything that would be admissible that's not in these questions, so at this point I'm going to sustain the objection.

Appellant failed to exercise a peremptory strike on veniremember Milner, and Milner served as a juror on the case. Appellant again relies solely upon *Smith*, 703 S.W.2d 641, in support of his claim that the trial court abused its discretion in limiting the

parole is not a consideration for the jury in a capital murder context.

questioning of veniremember Milner. We do not agree.

We note at the outset that the Texas sentencing scheme does not allow the jury to actually assess a sentence; a jury's role is limited to answering the three special issues set forth in Tex.Code Crim. Proc.Ann. art. 37.071(b). *Knox v. State*, 744 S.W.2d 53, 63–64 (Tex.Cr.App.1987). The proposed question, "what you as a layman think is a case that is proper for the death penalty ..." attempts to commit the prospective juror to a fact situation, unlike a hypothetical question used to explain the application of the law. *Allridge v. State*, 762 S.W.2d 146, 162–164 (Tex.Cr. App.1988); *Cuevas v. State*, 742 S.W.2d 331, 336, n. 6 (Tex.Cr.App.1987).

In attempting to show that the question was proper, counsel responded that he was eliciting "what factors [the veniremember] thinks ... would be things that would influence him in voting his verdict." The prohibited question, however, differs greatly. It does not focus on what factors, related to the sentencing scheme, that the veniremember thought were important. Instead, counsel inquired, "What I'm asking you is what you as layman think is a case that *is proper for the death penalty to be imposed*?" Appellant's argument on appeal likewise misstates the nature of the prohibited question. A party on appeal may complain only about the specific issue raised in trial. *Thomas v. State*, 723 S.W.2d 696 (Tex.Cr.App.1986).

In *Smith*, 703 S.W.2d at 645, we held that the trial court did not abuse its discretion in restricting counsel from asking potential jurors a broad, global question about "their thoughts" on the defense of insanity. Likewise, a vague question about "what things" the veniremember thought were important in determining whether an individual should receive a death sentence, *wholly unrelated to the sentencing scheme*, amounts to a fishing expedition going beyond the scope of proper voir dire. Counsel's question, unrelated to the sentencing scheme, was improperly broad. As such, the trial court did not abuse its discretion in limiting the voir dire in this respect. *Smith*, 703 S.W.2d at 645; *Faulder*, 745 S.W.2d 327.

Appellant's fourteenth point of error complains the trial court erred in limiting his voir dire examination of veniremember Kirkpatrick. Appellant complains of the following:

[DEFENSE COUNSEL]: And you realize the State has to prove to you there's a probability, they have to show you that, you know, in the first question that someone acted deliberately, they have to show you that there's a probability and they have to show that probability is they'd commit criminal acts of violence and they have to show all of those things beyond a reasonable doubt. Do you have any problem with that?

PROSPECTIVE JUROR: No.

[DEFENSE COUNSEL]: Okay. Now, then, in society, a continuing threat to society, what do you see society as being? You know that when you get to this question the person is already doing a life sentence. Do you see society, then, as being prison society or all of us, as you said, or how do you see that?

PROSPECTIVE JUROR: I see society as being all of us and the way we live.

[DEFENSE COUNSEL]: Okay. So, you don't—You wouldn't restrict that to, say, prison society alone, then; right?

PROSPECTIVE JUROR: No.

[DEFENSE COUNSEL]: Okay. Are you familiar with parole or the parole laws in any way?

PROSPECTIVE JUROR: No.

[DEFENSE COUNSEL]: Okay. If the Judge advised you that the law advised you that you would not consider parole for any purposes, would you be able to set that aside and not to have it intrude in any way in your deliberations?

PROSPECTIVE JUROR: Yes, I understand. I can do that.

[DEFENSE COUNSEL]: Okay. In other words,—

PROSPECTIVE JUROR: —look at the question itself.

[DEFENSE COUNSEL]: Life means life, and death means death? Would you

be—Would you take that attitude in regard to Question 2?

[THE PROSECUTOR]: Judge, I've just got to object to that. That's just—You know, the juror is not to assume life means every day behind bars; she's not to assume he'd get out, either. They're not supposed to answer these questions with regard to the result. That's 12.-31(b).[14]

THE COURT: It's on evidence. You answer it according to the evidence, whatever the evidence proves. I sustain the objection.

[DEFENSE COUNSEL]: We would object to the sidebar comment, though, in regard to the objection, the way it's improperly phrased. We would ask the juror be instructed to disregard.

THE COURT: Sidebar comment? I think he made an objection that—to your question. That's—And I sustained it.

[DEFENSE COUNSEL]: Note our exception.

THE COURT: Okay.

Appellant fails to cite us to a single case which arguably supports his theory that a potential juror's "view is supposed to be that a defendant sentenced to life will serve the rest of his life in prison." App. Brief at 36. As stated previously, the Texas sentencing scheme does not allow the jury to actually assess a sentence, as the jury's role is limited to answering the three special issues set forth in Tex.Code Crim. Proc.Ann. art. 37.071(b). *Knox v. State,* 744 S.W.2d at 63–64. We do not believe that veniremember Kirkpatrick's view on what "life" means is relevant, in the context presented, to answering those special issues. Veniremember Kirkpatrick stated that she would follow the court's charge and not consider parole in relation to the special issues. As such, the trial court did not abuse its discretion in limiting the questioning of veniremember Kirkpatrick. *Faulder,* 745 S.W.2d 327. Appellant's fourteenth point of error is overruled.

Appellant's fifteenth point of error complains that the trial court erred in refusing to instruct the jury on the law of parole at the punishment stage of trial. The record reflects that appellant requested that the jury be instructed on the law of parole as found in the former Tex.Code Crim.Proc.Ann. art. 37.07 § 4(a).

We pause to point out that the former Art. 37.07 § 4 excluded the instruction from the capital murder context, a practice that we approved in *Knox,* 744 S.W.2d at 63–64. Furthermore, appellant recognizes that we found that article to be an unconstitutional violation upon the separation of powers doctrine in *Rose v. State,* 752 S.W.2d 529 (Tex.Cr.App.1987).

Appellant urges us to adopt a dissenting opinion of a Justice on the Fifth Circuit Court of Appeals which urges the jury to consider parole, among other mitigating evidence, in the capital context. *King v. Lynaugh,* 850 F.2d 1055 (5th Cir.1988) (en banc) (Rubin, J., dissenting).

We decline to accept this approach, and uphold the sentencing procedure as applied in appellant's case. Appellant's fifteenth point of error is overruled.

### IV.

Appellant's sixteenth point of error alleges that the trial court erred in allowing the prosecutor to vouch for the evidence presented. During the punishment phase, while the State was laying the predicate for introduction of appellant's confessions, parts of which were deleted, the prosecutor made the following remarks:

Q. Now, I'm going to show you some documents, Mr. Johnson, but before I do let me just ask you a couple of questions. You understand the general rules, that if the State offers evidence, they vouch for the truth of it; correct?

A. Yes.

---

**14.** Tex.Penal Code Ann. § 12.31(b) states that prospective jurors "shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact.

Q. Unless they can disprove it by other methods; correct?

A. Yes.

[DEFENSE COUNSEL]: Your Honor, we would object to this as being bolstering and self-serving.

THE COURT: Sir?

[DEFENSE COUNSEL]: We'd object to this. It's not in the form of a question. It's bolstering, and it's self-serving.

THE COURT: Overrule your objection.

[DEFENSE COUNSEL]: It's also making for a legal conclusion on the part of a witness on which no proper predicate has been laid.

THE COURT: Maybe I didn't understand the question.

[THE PROSECUTOR]: Judge, the same thing we went through with Briseno.

[THE PROSECUTOR]

Q. You put anything in the confession that the defendant tells you; right?

A. I put what he told me, yes, sir.

Q. You understand the law allows the State to offer the part that we choose to and the Defense the part they choose to?

[DEFENSE COUNSEL]: That's what we're objecting to.

THE COURT: Yes, I—Don't go into— Don't go into what the law allows them to do. I sustain that.

[DEFENSE COUNSEL]: Ask the jury be instructed.

THE COURT: Yes, don't consider that statement for any purpose.

[DEFENSE COUNSEL]: Move for a mistrial.

THE COURT: Overruled.

Appellant contends that the prosecutor conveyed to the jury his personal belief that the evidence he was to present was true. To support his argument that this is reversible error, appellant cites *Robillard v. State*, 641 S.W.2d 910 (Tex.Cr.App.1982). That case, however, involves a prosecutor's statement in closing argument that, "a prosecutor who works for Mr. Henry Wade is not going to put evidence before the jury that he himself does not believe is true." *Id.*, at 911.

In the case at bar, the prosecutor was not stating to the jury his personal belief regarding the trustworthiness of the confession. Instead, the prosecutor was attempting to establish why certain portions of the statement had been excised, as was required by law under *Palafox v. State*, 608 S.W.2d 177, 181–182 (Tex.Cr.App.1979). See now *Russeau v. State*, 785 S.W.2d 387 (Tex.Cr.App.1990) (holding that Tex. R.Crim.Evid. 607 abrogates the common law voucher rule). The trial court obviously felt, however, that the manner in which the State sought to establish why certain portions were deleted was self-serving and bolstering, and sustained appellant's objections to that effect. The court likewise instructed the jury to disregard the statement. We hold that the instruction to disregard was sufficient to cure any error in the prosecutor's question. *Stringer v. State*, 632 S.W.2d 340, 343 (Tex.Cr.App. 1982). Appellant's sixteenth point of error is, therefore, overruled.

### V.

Appellant's seventeenth point of error submits that a fatal variance exists between the indictment and the evidence adduced at trial with regard to the means by which strangulation was accomplished. The indictment entered against appellant reads in pertinent part:

[t]hen and there intentionally cause the death of MARY MILLIGAN, an individual, hereinafter called the deceased, by strangling the deceased with his hands, *and by strangling the deceased with a means, the exact nature and description of which is unknown to the Grand Jurors,* and by drowning the deceased in a bathtub containing water, and the defendant intentionally did cause the death of the deceased while the said defendant was in the course of committing and attempting to commit the offense of burglary of a habitation of which the deceased was the owner, and while the said defendant was in the course of committing and attempting to commit the offense of robbery of the deceased.

The gist of appellant's argument is that the Grand Jury must exercise reasonable diligence to determine something before alleging that it is unknown to the Grand Jury. Appellant submits that because the only witness to testify before the Grand Jury was a prosecutor, appellant submits that the Grand Jury failed to adequately investigate the means by which the deceased was strangled.

 If the manner and means of committing an offense is alleged to be unknown to the Grand Jury, the State must prove that the Grand Jury did not know, and through the exercise of due diligence could not have known, of the exact means used in the commission of the offense. *McIver v. State*, 555 S.W.2d 755, 756 (Tex. Cr.App.1977). See also *Polk v. State*, 749 S.W.2d 813, 816 (Tex.Cr.App.1988).

The foreperson of the Grand Jury testified that the Grand Jury made a diligent inquiry into the manner and means of the strangulation that caused the deceased's death, that they inquired into what the medical examiner had to say, and that they reviewed the facts and circumstances of the case. The medical testimony at trial revealed that the exact manner and means by which the strangulation was accomplished was unknown. Although it was concluded that hands were considered to be the most likely cause, other explanations could not be excluded. Thus, the medical testimony at trial confirmed the testimony of the Grand Jury foreperson. We conclude that the State satisfied its burden of proving that the Grand Jury exercised due diligence to ascertain the manner and means of strangulation. Appellant's seventeenth point of error is overruled.

 Appellant's eighteenth and nineteenth points of error complain of the trial court's failure to include in the court's punishment charge that the jury be instructed not to consider any extraneous offenses unless they were proven beyond a reasonable doubt and that they could only consider the extraneous offenses in determining the answer to special issue number two. Appellant requested the following instruction:

> You are instructed that if there is testimony before you in this case regarding the Defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such offenses, if any were committed, and even then you may only consider the same in determining Special Issue Number 2 and for no other purposes.

Appellant fails to cite us to any authority or any part of the record which would indicate that the State was able to escape the beyond a reasonable doubt standard applicable to the special issues.

 Appellant also contends that the unadjudicated extraneous offenses should be limited to consideration of special issue number two. Put another way, appellant contends that it would be error for the jury to consider the extraneous offenses with respect to his deliberateness and provocation. We have previously held that there is no error attendant to a court's charge which fails to include such a requested instruction where the charge properly sets forth the State's burden of proof. *Santana v. State*, 714 S.W.2d 1, 11–12 (Tex.Cr. App.1986).[15] See also *Marquez v. State*, 725 S.W.2d 217, 226 (Tex.Cr.App.1987); *Turner v. State*, 805 S.W.2d 423, 428 (Tex. Cr.App.1991) (extraneous shooting offense a few hours before murder can be properly considered in determining provocation issue). The court's instructions in the case at bar properly specified that the State's burden was beyond a reasonable doubt, and during closing argument, the prosecutor stated that the jury must believe that appellant committed the extraneous offenses before they could be considered.

---

**15.** Santana's requested instruction sought a limiting instruction in the punishment charge to the effect that the jury could consider the extraneous offenses only if they believed beyond a reasonable doubt that the appellant committed the offenses, and then only insofar as they related to answering the second special issue. *Santana*, 714 S.W.2d at 10–11.

Appellant's eighteenth and nineteenth points of error are overruled.

## VI.

█ Appellant's twentieth and twenty-first points of error allege that Tex.Code Crim.Proc.Ann. art. 37.071 is unconstitutional on its face, and as applied, for failing to limit or guide the jury's consideration of unadjudicated extraneous offenses. It is appellant's contention that the lack of guidance with respect to unadjudicated extraneous offenses in the Texas sentencing scheme allows for the sentence of death to be imposed in an arbitrary and capricious manner.

Appellant recognizes that the admission of unadjudicated extraneous offenses at the punishment stage of a capital murder trial does not violate either due process or equal protection. *Aranda v. State*, 736 S.W.2d 702, 708 (Tex.Cr.App.1987). Appellant's argument focuses upon how much guidance the jury is given with respect to the admission of the extraneous offenses. To support this proposition, appellant cites *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). That case, however, is not dispositive of the issue.

In *Gregg*, the Supreme Court approved of Georgia's capital sentencing scheme which adopted a Model Penal Code approach, including a bifurcated trial and a weighing of aggravating circumstances and mitigating circumstances. The Texas capital sentencing scheme limits the number of death eligible offenses and further requires the jury to find evidence of deliberateness, future dangerousness and lack of provocation. This procedure adequately guides the jury's discretion in the imposition of death, both facially and as applied in the case at bar, with respect to the admission of the extraneous offenses. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). See also *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Williams v. Lynaugh*, 814 F.2d 205 (5th Cir.1987), cert. denied, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (admission of extraneous offenses in sentencing phase does not violate defendant's Eighth and Fourteenth Amendments). Appellant's twentieth and twenty-first points of error are overruled.

## VII.

█ Appellant's twenty-second point of error alleges that the trial court erred in denying his motion to dismiss the indictment for failure to give specific notice as to whether the State relied upon Tex.Penal Code Ann. § 30.02(a)(1) or § 30.02(a)(3).

Tex.Penal Code Ann. § 30.02(a)(1) states that a person commits burglary when one "enters a habitation, or a building not then open to the public with intent to commit a felony or theft." Section 30.02(a)(3) states that burglary is committed when one "enters a building or habitation and commits or attempts to commit a felony or theft."

We have repeatedly held that the constituent elements of the offense constituting the aggravating feature of a capital murder charge need not be alleged in the indictment. *Marquez v. State*, 725 S.W.2d 217, 235 (Tex.Cr.App.1987); *Landry v. State*, 706 S.W.2d 105, 107–108 (Tex.Cr.App.1986); *Hammett v. State*, 578 S.W.2d 699, 707–708 (Tex.Cr.App.1979). The trial court did not err in denying appellant's motion to dismiss the indictment. Accordingly, appellant's twenty-second point of error is overruled.

## VIII.

In his twenty-third and twenty-fourth points of error, appellant submits that the trial court erred by admitting appellant's confessions at the guilt/innocence and punishment phases of trial because appellant was not taken before a magistrate without unnecessary delay.

█ Tex.Code Crim.Proc.Ann. art. 15.17 mandates that one making an arrest shall, without unnecessary delay, take the arrestee before a magistrate. Absent a showing of a causal connection between the failure to take an accused before a magistrate and the accused's confession, however, the validity of a confession is not affected for failure to comply with the statute. *Ex parte Stansbery*, 702 S.W.2d 643 (Tex.Cr.

App.1986); *Maloy v. State,* 582 S.W.2d 125 (Tex.Cr.App.1979). Appellant fails to demonstrate any causal connection between his statement and the failure of the authorities to take him before a magistrate.

Additionally we have held that a violation of the requirement that a defendant be taken before a magistrate without delay will not invalidate a confession which was voluntarily given after a defendant received his *Miranda* rights. *Von Byrd v. State,* 569 S.W.2d 883, 893 (Tex.Cr.App. 1978). The record is replete with evidence that appellant was admonished of his *Miranda* rights prior to giving his confessions. Appellant's twenty-third and twenty-fourth points of error are overruled.

■ Appellant's twenty-fifth point of error complains that the trial court erred by admitting physical specimens given by appellant because appellant was not taken before a magistrate without unnecessary delay. Appellant submits that physical specimens taken from him should have been excluded from evidence based upon the failure of the officers to take him before a magistrate without delay. He contends that when he consented to providing hair and blood samples he was "not free to leave," yet he had not been brought before a magistrate. The record, however reflects that an investigating officer testified that when appellant was transported to the Southwest Institute for Forensic Science, appellant was free to leave. The officer further testified that appellant understood that he did not have to go to the Institute, and that if appellant had asked to go home, he would have been driven home. The record simply does not support appellant's assertion that he was under arrest at the time he gave the physical specimens. Accordingly, appellant's twenty-fifth point of error is overruled. *Shiflet v. State,* 732 S.W.2d 622 (Tex.Cr.App.1985).

The judgment of the trial court is affirmed.

McCORMICK, P.J., and CAMPBELL, WHITE, OVERSTREET and

BENAVIDES, JJ., concur in the result reached in Part I.A. but otherwise join the remainder of this opinion.

CLINTON, Judge, dissenting.

The majority believes the mitigating evidence in this cause is "much like that" in *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); it then reads the *Franklin* plurality opinion to hold that "the second special issue adequately encompassed the character evidence presented in that case;" *ergo,* mitigating character evidence, being "unlike" evidence directly addressed in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), i.e., mental retardation and abusive childhood, and also amounting to nothing more than "common courtesy which was given full effect with the special issue," has "no significance independent of its relevance to the second special issue." At 111–112. To test those views we must first revisit the opinions in *Franklin v. Lynaugh* and then take a closer look at *Penry.*

In *Franklin,* "The *sole mitigating evidence* petitioner presented was the stipulation that petitioner's disciplinary record while incarcerated from 1971–1974 and 1976–1980 was without incident." *Franklin,* 487 U.S. at 168, 108 S.Ct at 2324, 101 L.Ed.2d at 162.[1] The periods mentioned were both before and after the murder of deceased for which he was convicted. *Id.* at 177, 108 S.Ct. at 2328, 101 L.Ed.2d at 167.

The plurality opinion rejected the contention that the jury could not and did not adequately consider his disciplinary record during his periods of incarceration. *Id.* at 177–178, 108 S.Ct. at 2329, 101 L.Ed.2d at 168.

First noted was that Franklin was accorded a full opportunity to have the jury "consider and give effect to any mitigating impulse that [his] prison record might have suggested to the jury," *viz:*

"In resolving the second Texas Special Issue the jury was surely free to weigh and evaluate [his] disciplinary record as

---

**1.** All emphasis is mine here and throughout this opinion unless otherwise indicated.

it bore on his 'character'—that is, his 'character' *as measured by his likely future behavior.* We have never defined what the term 'character' means when we have held that a defendant's 'character' is a relevant consideration in capital sentencing. [note citing cases omitted]. But nothing in our cases supports [his] contention that relevant aspects of his 'character,' *as far as they were illuminated by the presentation of evidence concerning [his] disciplinary record,* encompassed anything more than those matters fully considered by the jury when it was asked to answer the second special issue.

Indeed, our discussion in *Skipper* [*v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986)] of the relevancy of *such disciplinary record evidence* in capital sentencing decisions dealt *exclusively* with the question of how such evidence reflects on a defendant's likely future behavior. See *Skipper, supra,* at 4–5 [106 S.Ct. at 1670–71]. * * * Furthermore, we note that nothing in petitioner's presentation or discussion of his prison record at the sentencing hearing urged the jury to consider petitioner's record as probative of *anything more than that the answer to the question posed by Special Issue Two should be 'No.'* ... Even in this Court, in seeking to define how his prison record shed light on one's 'character,' petitioner has cast his argument in terms of future dangerousness. [note omitted]." [2] *Id.,* 487 U.S. at 178–179, 108 S.Ct. at 2329–2330, 101 L.Ed.2d at 168–169.

Next, the plurality found unavailing his reliance on a statement in *Eddings v. Oklahoma,* 455 U.S. 104, at 114, 102 S.Ct. 869, at 877, 71 L.Ed.2d 1, at 11 (1982), that the sentencing jury may not be precluded from considering "any relevant mitigating evidence." Essentially its reasoning seems to be that although *Lockett v. Ohio,* 438 U.S.

586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), made clear that "the State cannot take out of the realm of relevant sentencing considerations the questions of the defendant's 'character,' 'record,' or the 'circumstances of the offense,'" and while "it may be advisable for a State to provide the jury with some framework for discharging these responsibilities," the Court has never held that "a specific method ... is constitutionally required." *Id.,* 487 U.S. at 179, 108 S.Ct. at 2330, 101 L.Ed.2d at 169. In short, except that it may not prevent consideration of such relevant evidence, the State is constitutionally free to deal with matters in mitigation (just as this Court had been doing since *Ex parte Granviel,* 561 S.W.2d 503, 516 (Tex.Cr.App.1978), on through *Adams v. State,* 577 S.W.2d 717, 730 (Tex. Cr.App.1979), *Quinones v. State,* 592 S.W.2d 933, 947 (Tex.Cr.App.1980), and *Stewart v. State,* 686 S.W.2d 118, at 121–122 (Tex.Cr.App.1984), to, including and beyond, e.g., *Penry v. State,* 691 S.W.2d 636, 653–654 (Tex.Cr.App.1985)).

Accordingly, the plurality concluded:

"We are thus quite sure that the jury's consideration of petitioner's prison record was not improperly limited. The jury was completely free to give that evidence appropriate weight in arriving at its answers to the Special Issues. *And as for the claim that the jury should have been instructed that, even if its answer to the Special Issues was 'Yes,' it was still entitled to cast an 'independent' vote against the death penalty, we note that this submission is foreclosed by Jurek, which held that Texas could constitutionally impose the death penalty if a jury returned 'Yes' answers to the two Special Issues.* [note responding to dissenting opinion omitted]." *Id.,* 487 U.S. at 179–180, 108 S.Ct. at 2330, 101 L.Ed.2d at 169.

That last pronouncement is the issue that most concerned the remaining members of

---

**2.** More specifically, Franklin argued that his behavior in prison demonstrated "the strength of character" such that "so long as he stayed in prison there was no probability that he would pose a threat to others." But the plurality agreed with the State's rejoinder that "the question of a defendant's likelihood of injuring others in prison is *precisely the question posed by the second Texas Special Issue.*" *Id.,* 487 U.S. at 179, n. 9, 108 S.Ct. at 2330, n. 9, 101 L.Ed.2d at 169, n. 9.

the Court, they, of course, constituting a majority.

In a separate concurring opinion joined by Justice Blackmun, Justice O'Connor expressed "doubts about a [capital punishment] scheme that is limited in such fashion." *Id.*, at 183, 108 S.Ct. at 2332, 101 L.Ed.2d at 172. She agreed, that to the extent the mitigating evidence was relevant to one of the special issues, the jury was free to give effect to that evidence by answering, "No." But she went on to posit a thesis that would become the central proposition which later would save the constitutionality of our death penalty statute, *viz:*

> " ... If, however, petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime *that was not relevant to the special verdict questions, OR that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions,* the jury instructions would have provided the jury with no vehicle for expressing its 'reasoned moral response' to that evidence. If this were such a case, then we would have to decide whether the jury's inability to give effect to that evidence amounted to an Eighth Amendment violation." *Id.*, at 185, 108 S.Ct. at 2333, 101 L.Ed.2d at 173.

But in her view this was not such a case:

> " ... The only mitigating evidence introduced by petitioner was the stipulation that he had no record of disciplinary violations while in prison. It is undisputed that the jury was free to give mitigating effect to this evidence in answering the special verdict question regarding future dangerousness. While it is true that the jury was prevented from giving mitigating effect to the stipulation to the extent

that it demonstrated *positive character traits other than* the ability to exist in prison without endangering jailers or fellow inmates, that limitation has no practical or constitutional significance in my view because the stipulation had *no relevance to any other aspect of petitioner's character.* * * *

The limited probative value of the stipulation regarding petitioner's lack of prison disciplinary violations is best illustrated by the contrasting examples of *probative character evidence suggested by the dissent. ... Evidence of voluntary service, kindness to others, or of religious devotion might demonstrate positive character traits that might mitigate against the death penalty.* Although petitioner argued to the sentencing jury that his prison record demonstrated his lack of future dangerousness, petitioner did not suggest that his lack of disciplinary violations revealed anything more positive about his character than that.... This is not surprising, because the lack of a prison disciplinary record reveals *nothing about a defendant's character* except that the defendant can exist in the highly structured environment of a prison without endangering others." *Id.*, at 185–186, 108 S.Ct. at 2333–2334, 101 L.Ed.2d at 173–174.

In other words, a good disciplinary record in prison is NOT like positive character traits than might militate against jurors' giving the death penalty and thus have relevance beyond the scope of the special issues.

So six Justices would not accept a "clean" disciplinary record while incarcerated as evidence of general character.[3] The plurality further found that *Jurek* foreclosed a claim that the jury should have been instructed that it was entitled to

---

**3.** As the plurality opinion recognized, the Supreme Court has never "defined what the term 'character' means when we have held that a defendant's 'character' is a relevant consideration in capital sentencing." See *ante,* at 125. However, as used in law, the term is not without definitions.

"The aggregate of the moral qualities which belong to and distinguish an individual person; the general result of one's distinguishing attrib-

utes." Black's Law Dictionary (Fourth Rev. Ed. 1968) 294; and see related definitions in decisions cited therein.

"Character is a generalized description of a person's disposition in respect to a general trait, such as honesty, temperance or peacefulness." 1A Wigmore, Evidence § 52, at 1148 (Tillers rev. 1983), as quoted in Goode, Wellborn & Sharlot, Texas Rules of Evidence § 404.2, 33 Texas Practice 104.

cast an independent vote against the death penalty on that evidence, *ante,* at 126; whereas two concurring Justices suggested otherwise with respect to, *inter alia,* evidence which "might demonstrate positive character traits that might mitigate against the death penalty," *ante,* at 127. The three dissenting Justices took a broader view concerning issues of admissibility and instructions respecting evidence of character.[4]

4. In his dissenting opinion Justice Stevens, with Justice Brennan and Justice Marshall, first explained mitigating effects of the fact that during imprisonment aggregating about seven years appellant committed no disciplinary violations, *viz:*

" ... That evidence militated against imposition of the death sentence in two quite different ways. Looking to the past, it suggested the possibility that petitioner's character was not without some redeeming features; a human being who can conform to strict prison rules without incident for several years may have virtues that can fairly be balanced against society's interest in killing him in retribution for his violent crime. Looking to the future, that evidence suggested that a sentence to prison, rather than to death, would adequately protect society from future acts of violence by petitioner. The evidence was admissible for both purposes.

* * * Past conduct often provides insights into a person's character that will evoke a merciful response to a demand to the ultimate punishment even though it may shed no light on what may happen in the future. *Evidence of past good behavior in prison is relevant in this respect just as is evidence of honorable military service or kindness to those in the defendant's community or regular church attendance.* Although it may aid the sentencer in predicting the defendant's future conduct, it also tells the sentencer something about the defendant's personality. Importantly, for example, it may suggest that the conduct of which defendant stands convicted was not in keeping with his or her usual qualities or traits, a fact that has as much relevance to culpability as to future dangerousness. Further, the evidence of petitioner's past prison conduct was relevant to show the appropriateness of the alternative punishment of imprisonment *for him,* another reflection of his character. (emphasis in original) *Thus evidence of petitioner's conduct in prison 'encompassed ... more than [just] those matters ... considered by the jury when it was asked to answer the second Special Issue,'* ... which asked only if there was a probability that petitioner would commit future criminal acts of violence." *Id.,* 487 U.S. at 189–191, 108 S.Ct. at 2335–2336, 101 L.Ed.2d at 176.

The resultant proposition supported in common by the concurring and dissenting opinions is that mitigating evidence about back-ground, *character* or circumstances of the offense may have relevance beyond the scope of the special issues. The majority opinion in *Penry* accepted that proposition and made it the *ratio decidendi* that saved our capital punishment scheme under Article 37.071, V.A.C.C.P., from certain constitutional extinction. *Penry,* 492 U.S.

The dissenters went on to point how applicable law required an appropriate instruction, *viz:*

"Our cases explicating the role of mitigating evidence in capital sentencing have rigorously enforced one simple rule: *A sentencing jury must be given the authority to reject imposition of the death penalty on the basis of any evidence relevant to the defendant's character or record or the circumstances of the offense* proffered by the defendant in support of a sentence less than death. That rule does not merely require that the jury be allowed to hear any such evidence the defendant desires to introduce [citations omitted], it also requires that the jury be allowed to give 'independent mitigating weight' to the evidence. *Lockett v. Ohio,* 438 U.S. 586, 605 [98 S.Ct. 2954, 2965, 57 L.Ed.2d 973] (1978) [note omitted]; *Eddings v. Oklahoma,* 455 U.S. 104, 112–113 [102 S.Ct. 869, 875–76, 71 L.Ed.2d 1] (1982). * * *

On its face, the Texas capital punishment scheme makes no mention of mitigating evidence.... Although the jury was informed that if it answered both issues 'yes' petitioner would be sentenced to death, *neither of the Special Issues* as they would have been understood by reasonable jurors *gave the jury the opportunity to consider petitioner's mitigating evidence of past good conduct in prison to the extent that it encompassed matters beyond those relevant to answering the Special Issues.* Petitioner was therefore at least entitled to *an instruction informing the jury that it could answer one of the issues 'no' if it found by that evidence that petitioner's character was such that he should not be subjected to the ultimate penalty.* The failure to give such an instruction removed that evidence from the sentencer's consideration just as effectively as would have an instruction informing the jury that petitioner's character was irrelevant to its sentencing decision." *Id.,* 487 U.S. at 191–193, 108 S.Ct. at 2336–2337, 101 L.Ed.2d at 177–178.

Accordingly, the dissenters concluded: "Under our cases, the substantial risk that the jury failed to perceive the full ambit of consideration to which evidence of petitioner's past good conduct was entitled requires us to vacate the death sentence and remand for resentencing." *Id.* at 194, 108 S.Ct. at 2338, 101 L.Ed.2d at 179.

at 320–21, 109 S.Ct. at 2948, 106 L.Ed.2d at 279–280.

The Supreme Court agreed with Penry that "his mitigating evidence of mental retardation and childhood abuse has relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its 'reasoned moral response' to that evidence in determining whether death was the appropriate punishment." *Id.* at 322, 109 S.Ct. at 2948, 106 L.Ed.2d at 280. It disagreed with the State's contention that to so enable the jury by instructing that it could render "a discretionary grant of mercy, or say 'no' to the death penalty ... would be to return to the sort of unbridled discretion that led to *Furman v. Georgia* [.]"

"... But as we made clear in *Gregg [v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ], so long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant. *Id.* at 197–199, 203 [96 S.Ct. at 2936–37, 2939]. * * *

'In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence.' *McCleskey v. Kemp,* 481 U.S. 279, 304 [107 S.Ct. 1756, 1773, 95 L.Ed.2d 262] (1987) ... (emphasis in original). Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an un-

guided emotional response, *full consideration of evidence that mitigates against the death penalty is essential* if the jury is to give a 'reasoned *moral* response to the defendant's background, character, and crime,' *Franklin,* 487 U.S., at 184 [108 S.Ct. at 2333], ... (opinion concurring in judgment) [last emphasis in original] (quoting *California v. Brown,* 479 U.S. [538] at 545 [107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) ] (concurring opinion)). In order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,' ... the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime." *Id.,* 492 U.S. at 328, 109 S.Ct. at 2951, 106 L.Ed.2d at 283–284.

Applying the law thus declared, the majority came to its conclusion in *Penry, via:*

"In *this* case, in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and *abused background* by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision. Our reasoning in *Lockett* and *Eddings* thus compels a remand for resentencing so that we do not 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.' *Lockett,* 438 U.S., at 605 [98 S.Ct. at 2965], ... *Eddings,* 455 U.S., at 119 [102 S.Ct. at 879], ... (concurring opinion). 'When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.' *Lockett,* 438 U.S., at 605 [98 S.Ct. at 2965]." ... *Id.,* 492 U.S. at 328, 109 S.Ct. at 2952, 106 L.Ed.2d at 284.[5]

---

**5.** Skeptics with doubts about a constitutional demand that "the jury [must be] provided with a vehicle for expressing its 'reasoned moral response' to [mitigating] evidence in rendering its sentencing decision" will gain an understanding of its breadth upon perusing Part II-B of the opinion concurring in part and dissenting in

part by Justice Scalia. He perceives the *Penry* formulation to be "a scheme that simply dumps before the jury all sympathetic factors bearing upon the defendant's background and character, and the circumstances of the offense, so that the jury may decide without further guidance

While it is true that the mitigating evidence in *Penry* is limited to mental retardation and abusive childhood, beyond peradventure the Supreme Court laid down a constitutional rule applicable to more kinds of relevant mitigating evidence than those two, *viz:* background, character, record, or circumstances of the offense.

As to character, a majority in *Franklin* agreed that, for example, voluntary service, kindness to others, and religious devotion might demonstrate positive character traits which may mitigate against the death penalty—expressly contrasting lack of prison disciplinary violations. Yet, unlike the *Franklin* majority, the majority here equates the former with the latter, and summarily—but contrary to the *Franklin* majority—says the former is given "full

effect with the [second] special issue." At 112.[6]

In my view, the majority egregiously misreads *Penry* and opinions reflecting majority views in *Franklin* in this rare instance involving positive character traits. Compare *Gribble v. State*, 808 S.W.2d 65 (Tex.Cr.App., 1990). Therefore, I respectfully dissent to such an early departure from their teachings.

MALONEY, J., joins.

---

whether he [deserves to die]." See 492 U.S. at 359, 109 S.Ct. at 2968, 106 L.Ed.2d at 304.

Hyperbole in opposition to a proposition may well serve to enhance an appreciation of its rational verity—as expressed by the late Judge Morrison:

"Some discretion is inherent and desirable in any system of justice, from arraignment to final judgment. ... To eliminate all discretion on the part of the jury would be to risk elimination of that valuable element which *permits individualization based on consideration of all extenuating circumstances and would eliminate the element of mercy*, one of the fundamental traditions of our system of criminal jurisprudence." *Jurek v. State*, 522 S.W.2d 934, at 940 (Tex.Cr.App.1975).

Alas, only Judge Odom rightly discerned that our newly enacted scheme "allow[ed] no discretion in determining the punishment to be received by a defendant who is guilty of capital murder." *Id.*, at 944. Now, however, with the formulation of *Penry*, the mandate that a jury shall be allowed to exercise its discretion has been restored, and it must be provided with a vehicle for expressing its "reasoned moral response" to mitigating evidence in rendering its ultimate decision.

6. The majority says that any other holding "would be tantamount to declaring the capital sentencing scheme unconstitutional." At 112. It must have in mind the proverbial caution about never allowing "the nose of the camel inside the tent." That is, to recognize a character trait that it labels as "common courtesy" could raise the flap for other asserted traits that ultimately would overcome the deadly consequences of affirmative answers to special issues.

Moreover, the majority seems to believe the constitutionality of our scheme is securely in-

tact, as is. But the plurality opinion in *Franklin* rejected a claim that refusal to give his requested instructions violated his Eighth Amendment right to present mitigating evidence, and expressly concluded his submission that a special instruction allowing the jury "to cast an 'independent' vote against the death penalty ... is foreclosed by *Jurek*," noting that *Jurek* has not been overruled, "and we are not inclined to take any such action now." *Id.*, 487 U.S. at 180, 108 S.Ct. at 2330, 101 L.Ed.2d at 169. Its disinclination is fully justified, of course, by the facts that Franklin himself did not challenge the constitutionality of the scheme and expressly "disavowed any request for this Court to overrule its decision in *Jurek*." *Id.*, 487 U.S. at 171, 108 S.Ct. at 2325, 101 L.Ed.2d at 164.

*Penry* is another matter, however. As in *Franklin*, Penry contended that "in the absence of his requested jury instructions, the Texas death penalty statute was *applied in an unconstitutional manner* by precluding the jury from acting upon particular mitigating evidence he introduced." *Id.*, 492 U.S. at 320, 109 S.Ct. at 2947, 106 L.Ed.2d at 279. It cannot be gainsaid that this time the Supreme Court agreed; mainly because a majority "understood *Jurek* as resting fundamentally on the *express assurance* that the special issues would permit the jury to fully consider all the mitigating evidence a defendant introduced that was relevant to the defendant's background, character, and to the circumstances of the offense," only to discover that in truth and in fact such assurance was not being implemented in actual practice. *Id.*, 492 U.S. at 321, 328-30, 109 S.Ct. at 2948, 2952, 106 L.Ed.2d at 279-280, 284.

With deference, I suggest appellant is not inviting us "to overrule established Supreme Court precedent," but merely to apply the clear holdings of *Penry* to the facts of his case.