11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Yesenia Hernandez

Appellant

Vs.                   No.
11-02-00300-CR -- Appeal from Dallas County

State of Texas

Appellee

 

The jury
found that Yesenia Hernandez was guilty of capital murder.[1]  The State did not seek the death penalty,
and the trial court assessed the mandatory punishment of imprisonment for life.[2]  We affirm.

                                                                   The
Indictment

The
indictment charged that, on or about August 29, 2001, appellant did unlawfully,
intentionally, and knowingly cause the death of her son, Roy Aguilera:

[A]n individual, hereinafter called deceased,
by striking deceased with a broom handle, a deadly weapon, and by shaking
deceased with her hand and hands, a deadly weapon, and by striking deceased
with and against an object, a deadly weapon, the exact nature and description
of which is unknown to the Grand Jurors, and any combination thereof, and the
deceased was at the time of the offense under six years of age.

 

                                                                   Points
of Error








Appellant
presents eight points of error.  She
argues in Points of Error Nos. 1 and 2 that the trial court erred in admitting
proof of the written statements which she signed, and she argues in Points of
Error Nos. 3 and 4 that the trial court erred in admitting proof of the oral
statements which she made.  Appellant
argues in Points of Error Nos. 5 and 6 that the evidence is Alegally@ insufficient and Afactually@
insufficient to prove that she intentionally caused the death of her son.  She argues in Point of Error No. 7 that the
trial court erred in permitting Agruesome photographs@ to be introduced into evidence and in Point of Error No. 8 that she
was not given proper notice of the Aextraneous offenses.@ 

                                                                    The
Evidence

The jury
heard testimony from 16 witnesses, all of whom were called by the State.  There were no witnesses for the defense.

1.  Kelly Fowler, a caseworker for Child
Protective Services (CPS), testified about the foster care which appellant=s son and daughter received and about the
reason that CPS had taken the children from appellant and her boyfriend.  Appellant sued CPS to get the children back,
and Fowler said the jury in that case Asent the children home.@    

2.  Rebecca Calvo, a Spanish-speaking
investigator for CPS, had been the caseworker when CPS worked on the prior case
involving appellant and her children. 
Calvo identified a picture of appellant=s son and testified that he was a Abeautiful baby,@ that he was Awell-behaved,@ that he Asmiled a lot,@ and
that she never saw him crying while he was in foster care.  Calvo also testified that she was the one who
returned the two children to appellant after the jury trial in the earlier
case.  Calvo said that the caseworkers
felt like Athe kids were at risk@ and that they would get another call
concerning those children.  Calvo also
testified that she went to the hospital to see the child when she got a call
that he was in the hospital in critical condition.  Since she knew appellant from the earlier case, Calvo was the one
who was called to translate when appellant was arrested and taken to jail in
connection with her son=s injuries. Relevant portions of her testimony read as shown:

Q: Why did
you-all go to the jail?

 

A: We were
aware that [appellant] was pregnant and she was close to delivering her baby,
and we needed some information regarding her condition.

 

Q:
Pregnant by who?

 

A: Her
live-in boyfriend, José Aguilera.  

 

                                                           *    *   
*

 

Q: Do you
work with the police department at all? 
Do you work for them?

 








A: Not at
all.

 

Q:
Okay.  So what do you tell her that your
job is?

 

A: When
[we] went in there, I introduced myself, to remind her who I was and that I was
with Child Protective Services and that we wanted to get some information
concerning her condition: her pregnancy.

 

                                               *    *   
*

 

Q: So what
did [appellant] tell you?

 

A:
[Appellant] began telling me about the day of the incident....She also
admitted that she did what she did, because she did not love her son and that
she only loved her five year old daughter.

 

She told
me that the reason why she had fought CPS back then, when we first became
acquainted, was because she was fighting for her five year old little
girl.  She had done it all for her
little girl.  Her name=s Yesenia, also.  And that she never wanted to get [her son] back, because she didn=t love him.

 

Q: Did she
ever say, AJosé did this.  I didn=t do
it@?

 

A: She did
not.  She admitted to having done
everything.  I was stunned.  I was very surprised.    (Emphasis added)

 

During her
cross-examination, Calvo agreed with appellant=s attorney that appellant did not Aspecifically say@ that she caused her son=s death and that she did not say that she Aintentionally@ burned him; however, appellant did not use the word Aaccident@ in connection with the burns.  








3. Officer James McLellan
of the Irving Police Department testified that the dispatcher sent him to an
apartment on August 30, 2001, in response to a A911 hang up call@; the officer arrived at 4:35 p.m., went upstairs, and knocked on the
door.  The door was unlocked, and the
officer realized that it was Apossibly an emergency situation.@  Officer McLellan opened the
door, announced himself, and went into the apartment.  A Hispanic male came from a back bedroom and Amotioned@ the officer to come there; the man did not speak English; and the
officer could see that the baby=s breathing was labored and raspy. 
The paramedics were already on their way, and they arrived soon after
the police officer.  Officer McLellan
stayed there while the paramedics treated the child, and he saw that the baby
had a Aburn mark@ and that there were scratches and bruises Aall over the body.@  

  4. 
Jack G. Taylor, a firefighter/paramedic for the City of Irving,
testified that he arrived a Afew seconds@ after
the police officer.  Taylor saw the baby
on the bed, and he knew immediately that the baby was having trouble
breathing.  Taylor described the baby=s condition: 
the legs were thin; the knees were swollen; there were bruises on the
legs; the right calf was swollen; there were several abrasions on the head;
there were indications of a skull fracture; there were scratches and abrasions
on the face; and there was a missing portion or bad gash of the left upper
lip.  Two more paramedics arrived, and
they documented the findings.  Taylor
also described a bad burn scar on the baby=s side and said that the left upper arm was swollen to twice the size
it should have been, that there were obvious fractures in that arm, and that
the arm was obviously dislocated.  There
was also a burn on the baby=s right hand.  They took the
baby to the hospital.  Taylor said that
this was the most severe case of child abuse that he had seen.

5.  Julia McDonald, M.D., a pediatric physician
in the emergency room at Children=s Medical Center, was working on the afternoon of August 30 when
appellant=s son was brought to the hospital.  Dr. McDonald authenticated the medical
records and photographs of the child, and they were admitted into
evidence.  Dr. McDonald discussed the
injuries which she found; they included second and third degree burns,
scratches, bruises, bite marks, and broken bones.  Dr. McDonald also said that the ACT showed a subdural hematoma@ which could have been caused by shaking the baby.  Dr. McDonald testified that she had never
seen Aa case this bad, of child abuse.@ 
During cross-examination, Dr. McDonald agreed that Asome of these injuries@ could have been caused by accident, but not
all of them.  During her redirect
examination, Dr. McDonald testified that she found Afractures of different ages@ and Awounds healing of different ages.@

6.  Barry Hicks, M.D., a pediatric surgeon and
director of the trauma center at Children=s Medical Center, was also involved in the treatment of appellant=s son. 
Dr. Hicks said that the boy had Amultiple injuries,@ broken bones of different ages, burns of different ages, and bruises
of different ages.  Dr. Hicks said that
the boy had a severe head injury and that he was unconscious for several days
before he died.  Dr. Hicks testified
that it was the Aworst@ battered child case that he had ever seen.  During his cross-examination, Dr. Hicks agreed that the head
injury was the cause of the child=s death.








7.  Consuelo Villalobos testified through an
interpreter that appellant came from Houston to live with her husband=s nephew. 
They were not married. 
Villalobos testified that appellant came to her house on the night that
appellant=s son was taken to the hospital and that
appellant did not tell her anything except that Athe boy was taken by the ambulance.@  Villalobos testified that the
police came to her house; that she remembered them talking to appellant; and
that the police treated appellant with respect.  Villalobos testified that appellant was cooperative and that she
went with the police voluntarily.   

8.  Dr. Robert Glenn Williams testified that he
is a forensic dentist for the Southwestern Institute of Forensic Sciences, that
he took impressions from appellant=s mouth to see if her teeth generated the bite marks which were found
on her son=s body, and that there was a match between
appellant=s teeth and the bite marks which were found. 

9.  Pattie Booth, an investigator for CPS,
testified that she went to the hospital to see appellant=s son and that she arrived a few minutes
after the ambulance.  Two other
investigators went to the police station. 
Booth took pictures while the doctors and nurses were working.  Booth said that the boy=s injuries were Acatastrophic,@ that he was Anever
conscious,@ and that there was a Ahuge team of medical staff...fighting for
this little guy.@ 
Booth took photographs to the police station for the other investigators
to use while they were interviewing appellant and the Astepfather.@  Booth took appellant=s daughter so that CPS could arrange
placement for her.

10.  Officer Steven Hazard of the Irving Police
Department testified that he was assigned to the Crime Scene Search Unit and
that he took pictures of the apartment where appellant lived with her boyfriend
and her two children.  He described the
pictures, and they were admitted into evidence.  Some of the pictures showed bloodstains and traces of blood.  








11.  Detective Jack Jeffrey of the Irving Police
Department testified that he was assigned to the Domestic Violence Unit, that
he was at home on August 30 when he was called back to the police station, that
he was told that they had an Ainjury to a child@ case, and that the man who had called the police was at the police
station.  After he talked to that man,
Detective Jeffrey located appellant and talked to her through an interpreter.  When he had the interpreter ask appellant
about the last time that her child had seen the doctor, appellant said
something like: A[W]e have neglected the child.@ 
Detective Jeffrey said that, at that point, he realized that appellant
was a suspect, and he had the interpreter read the Miranda warnings[3]
to her in Spanish.   Detective Jeffrey
said that appellant indicated that she understood those warnings and that she
signed the Miranda card which had been read to her.  Detective Jeffrey decided that he needed the
assistance of a Spanish-speaking officer, and he stopped the interview and had
appellant arrested.  

On the
afternoon of August 31, Detective Jeffrey and Officer Ray Delacruz started
their interview of appellant at about 5:00 p.m.  Officer Delacruz read her the Miranda warnings in Spanish,
and he had her sign another Miranda card.  The officers would show appellant pictures of the baby and ask
her to describe how the injuries happened. 
Appellant would tell Officer Delacruz in Spanish, and he would dictate
the translation in English.  After the
clerk-typist typed the statement, a civilian witness was present when the
statement was read back to appellant. 
The witness was told in Spanish what the statement said in English.  The statement showed 12 different places
where the witness added something that she wanted or scratched out something
that she did not want.  Each of those
revisions was initialed by appellant when she signed the statement.  

On
September 5 and again on September 7, Detective Jeffrey and Officer Delacruz
went back to the jail for the second and third statements which were signed by
appellant.  Those two statements were
very short, and appellant wrote each of them herself.  During his cross-examination, Detective Jeffrey agreed that he
did not speak Spanish, that he did not know exactly what appellant was trying
to tell Officer Delacruz, and that the interview was neither videotaped nor
audiotaped.

12.  Naomi Pastrano, a program director for CPS,
testified that she was called into this case to assist in translating.  She went with the Irving police officer to
try to find the five-year-old child. 
Pastrano asked appellant if she would go to the police station with
them, and appellant was cooperative. 
Pastrano said that she read the Miranda card warnings to
appellant, that appellant appeared to understand what was going on, and that
appellant signed the warning card.  








13.  Officer Ray Delacruz of the Irving Police
Department testified that Spanish was his first language and that he was
bilingual in Spanish and English. 
Detective Jeffrey brought Officer Delacruz into the case to assist in
the interview with appellant on August 31. 
Appellant had already been arrested, and the interview was done in
Detective Jeffrey=s
office.  Officer Delacruz testified that
he read the Miranda rights to appellant in Spanish at the very beginning
of the interview.  Officer Delacruz
asked appellant if she wanted to write the statement or if she wanted him to
dictate the statement and have it typed. 
She preferred to have the statement dictated and typed.  Appellant would answer Officer Delacruz=s questions in Spanish, and then he would
dictate the statement in English.  After
the statement was typed in English, a civilian witness who spoke English and
Spanish observed and made sure that the statement was correctly translated when
it was read back to appellant in Spanish. 
Appellant made several changes to her statement.  She initialed each insertion and each
deletion, and then she signed the statement. 
After the statement was admitted into evidence, Officer Delacruz read it
to the jury.  Relevant portions of the
statement read as shown:

I, Yesenia
Cruz Hernandez, am 20 years old and live at the apartments on Shoaf St. in
Irving, TX.  I=m making this statement to law enforcement
officer Ray De La Cruz.

 

I live
with José Guadalupe Aguilera.  I am six
months pregnant with his child.  I also
have a five-year daughter name Yesenia from a prior marriage and a one year old
baby boy named Roy Aguilera....After my son was returned to me, I never
loved him the same after that.  I didn=t love him after they returned him.  I was okay with him for a few months, and
then I did those things to him....Then after I got pregnant, I started to treat
him bad.  Investigator De La Cruz showed
me pictures of the injuries, and I told him how I did the injuries.  He
showed me a picture of a fingernail, and I caused the injury on the fingernail
by biting him.  That=s been about a month ago, but then he
re-injured it.  He showed me a picture
of the burn mark on his back, and I did that last Monday with a hot iron.  He has an injury on his right arm....That
was caused by teeth marks where I bit him two times.  The burn on his hand, I did that about a day before I burned him
with the iron.  I put a hot pan on the
table and he touched it, but I let him touch it.  He also showed me some injuries on the left side of his neck, and
I did those with my hands.  Those are
scratches.  What he has on his ears are
where I squeeze them with my fingers. 
The scratches on his head, I did those with my hands by pulling his
hair.  The injuries that he has on his
forehead is where I hit him with a broomstick a week ago.  The injury on his left arm, the one that was
swollen, I caused it about two months ago.  He was about to fall from the bed and to keep him from falling I
grabbed him by the arm and yanked him up and I heard his arm pop.  After that, he wouldn=t lift up his arm.  (Emphasis added)

 

 

 








Officer
Delacruz also testified about the two short statements which were written by
appellant in Spanish in her own handwriting. 
Appellant said in her statement on September 5: 

[W]hen I hit the boy on the forehead with the
broom handle, I just hit him once but I hit him hard last Tuesday was when I
hit him a week ago I hit him.

 

Appellant said in her
statement on September 7: 

[O]n Wednesday I pulled his hair hard from
side to side and I moved his head from side to side where I was pulling his
hair after a little bit he began to not have enough air and to have an attack
and on the following day the ambulance took him away.  I pulled his hair in the same place where I hit him with the toy
a month before.

 

During his
cross-examination, Officer Delacruz agreed that he was not certified as a
translator, and he also agreed that the statement could have been taken in
Spanish and then translated into English by a certified translator.  Officer Delacruz agreed that the statement
could have been audiotaped or videotaped, and he said that he knew that
appellant had only a third grade education.

14.  Alma Cariado testified that she was a
dispatcher for the Irving Police Department and that she spoke Spanish.  She witnessed the statement which appellant
gave to Officer Delacruz.  Cariado heard
him ask appellant if it was her statement and if she gave it freely and
voluntarily, and she heard appellant answer: AYes.@ 
Cariado testified that she stood next to Officer Delacruz while he read
the statement, that he translated it from English into Spanish as he read it to
appellant, and that he translated it correctly.  Cariado testified that appellant appeared to understand what was
going on.  During her cross-examination,
Cariado agreed that appellant was in handcuffs and that she was not free to
leave the room.

15.  Dr. David Dolinak testified that he was the
medical examiner who performed the autopsy on appellant=s son. 
Dr. Dolinak authenticated the 14-page autopsy report, and it was
introduced into evidence.  Dr. Dolinak
said that the autopsy was Aspread over two days@ because there were Aso many injuries to document.@  Dr. Dolinak was recalled on
the last day of trial, and he discussed the autopsy photographs which were
admitted into evidence over appellant=s objection.[4]  The photographs will be further discussed in
connection with Point of Error No. 7.








16.  George Cowart testified that he was a member
of the grand jury which returned the indictment in this case; that the grand
jury was not able to Adetermine
exactly what object struck the child that caused these injuries@; and that, according to the testimony given
to the grand jury, there was not any additional investigation which could have
been done to determine Athe exact nature and description of the weapon@ that caused the death of appellant=s son.

                                                            The
Written Statements

Appellant
argues in her first two points of error that the trial court erred in admitting
her written statements into evidence. 
Appellant argues that those statements were not Afreely and voluntarily made without
compulsion or persuasion.@  See TEX. CODE CRIM. PRO. ANN.
art. 38.21 (Vernon 1979).  Appellant
also argues that the admission into evidence of these statements was a
violation of her rights under U.S. CONST. amends. V and XIV; a violation of her
rights under TEX. CONST. art. I, ' 19; and a violation of her rights under TEX. CODE CRIM. PRO. ANN. art.
38.23 (Vernon Pamph. Supp. 2003).  

The record
supports the trial court=s finding that appellant=s statements were freely and voluntarily made without compulsion or
persuasion.  See Guzman v. State,
955 S.W.2d 85, 89 (Tex.Cr.App.1997), which makes it clear that an appellate
court should give Aalmost
total deference to a trial court=s determination of the historical facts@ which the record supports when they are based upon an evaluation of
credibility and demeanor.  Both the
documentary evidence and the testimony support the trial court=s finding that appellant voluntarily made,
signed, and verified all three written statements and that there was no
compulsion or persuasion.  The trial
court determined these issues by looking at the totality of the
circumstances.  See, e.g., Schneckloth
v. Bustamonte, 412 U.S. 218, 227 (1973). 
The fact that there was a delay in taking appellant before a magistrate,
without the  Ashowing of a causal connection@ between the delay and the confession, does
not affect the validity of appellant=s confessions.  See, e.g., Boyd
v. State, 811 S.W.2d 105, 124 (Tex.Cr.App.), cert. den=d, 502 U.S. 971 (1991).  Points
of Error Nos. 1 and 2 are overruled.

                                                               The
Oral Statements








Appellant
argues in her next two points of error that the trial court erred in overruling
her objection to testimony by Calvo (the CPS employee).  Appellant cites Cates v. State, 776
S.W.2d 170, 173 (Tex.Cr.App.1989), in support of her contention that this CPS
employee was Aoperating as an agent of law enforcement.@  Cates
is factually distinguishable because: 
(1) that investigator was not conducting a routine interview to assist
in solving a problem within the family unit; and (2) those statements were made
in direct response to questions from the investigator.  See Cates v. State, supra at
174.  

The
investigator in the case before us was not operating as an agent of law
enforcement, and the oral statements by appellant were not made in response to
questions.  See Cantu v. State,
817 S.W.2d 74, 75 (Tex.Cr.App.1991), where the court discussed the facts which
distinguish Cates from the case which is now before us.  The court also made it clear in Cantu v.
State, supra at 77:

At a
suppression hearing the trial judge is the sole judge of the credibility of the
witnesses and of the weight to be given the testimony.  The judge may believe or disbelieve any or
all of any witness=
testimony.  Those findings should not be
disturbed absent a clear abuse of discretion. 
(Citations omitted)

 

See also Paez v. State,
681 S.W.2d 34 (Tex.Cr.App.1984), where the facts were similar to the facts in
the case which is now before us.

The trial
court did not abuse its discretion in overruling appellant=s motion to suppress her oral statements to
the CPS employee and in overruling her objections to this testimony.  Appellant=s spontaneous, unsolicited oral statements were not in response to
interrogation.  See Miranda v.
Arizona, 384 U.S. 436, 478 (1966). 
Moreover, appellant did not have the Sixth Amendment right to counsel
during an interview on a civil matter because that right is Aoffense specific.@  See McNeil
v. Wisconsin, 501 U.S. 171, 174 (1991). 
Points of Error Nos. 3 and 4 are overruled.   

                                                          Sufficiency
of the Evidence

The
evidence which is summarized above is both Alegally@ and Afactually@
sufficient to support appellant=s conviction for the capital murder of her son.  We have reviewed all of the evidence, and we
have determined that a Arational trier of fact could have found the essential elements of the
offense beyond a reasonable doubt.@  Jackson v. Virginia,
443 U.S. 307 (1979); Vasquez v. State, 67 S.W.3d 229, 236
(Tex.Cr.App.2002).  Point of Error No. 5
is overruled.

This court
has also determined that the conviction is neither so Aobviously weak@ nor so Agreatly outweighed@ by contrary evidence that the conviction is Aclearly wrong and manifestly unjust.@  Vasquez
v. State, supra.  Point of Error No.
6 is overruled.








                                                        The
AGruesome@ Photographs

Appellant
argues in Point of Error No. 7 that the trial court erred Ain permitting gruesome photographs to be
introduced into evidence.@  Appellant=s argument under this point refers to several
autopsy photographs which Dr. Dolinak said would help him describe the
injuries.  When the State offered the
autopsy photographs, appellant objected, and the trial court had a hearing
outside the presence of the jury.  After
an overnight recess, several of the autopsy photographs[5]
were admitted into evidence and described by Dr. Dolinak.  Appellant complains in her brief about
photographs of the child=s arm and arm bones (State=s Exhibit Nos. 121, 123, 124, 125, 126, and 127) and about photographs
of the child=s skull and brain (State=s Exhibit Nos. 140, 141, and 142).

 See Harris v. State, 661 S.W.2d 106,
107 (Tex.Cr.App.1983), another case involving autopsy photographs of a child
who had died from abuse, where the court quoted the rule which was adopted in Martin
v. State, 475 S.W.2d 265 (Tex.Cr.App.1972):

[I]f a photograph is competent, material and
relevant to the issue on trial, it is not rendered inadmissible merely
because it is gruesome or might tend to arouse the passions of the jury,
unless it is offered solely to inflame the minds of the jury.  If a verbal description of the body and
scene would be admissible, a photograph depicting the same is admissible.  (Emphasis added)

 

The determination of
admissibility of photographic evidence is Aleft to the trial court=s discretion.@  Harris v. State, supra; Martin v.
State, supra.  Consequently, a trial
court does not abuse its discretion if the photographs:

[W]ill help the jury to understand verbal
testimony, such as the technical language used by a medical doctor in
describing the injuries sustained by a victim of a crime.  








 

The trial
court did not abuse its discretion in permitting the autopsy photographs to be
admitted into evidence.  They helped the
doctor explain his findings.  Even
though the injuries to the arm were not the probable cause of the child=s death, the photographs of the arm were
relevant under TEX.R.EVID. 401 on the issue of appellant=s intentional child abuse which ultimately
led to the death of her child. 
Appellant=s intent can be Ainferred from [her] conduct.@  Patrick
v. State, 906 S.W.2d 481, 487 (Tex.Cr.App.1995).  The autopsy findings did not refer to Aextraneous@ injuries; the child=s massive injuries were interconnected and overlapping injuries.  Point of Error No. 7 is overruled.  

                                                      Notice
of AExtraneous@ Offenses

Appellant
argues in Point of Error No. 8 that she was not given Aproper notice of extraneous offenses.@  The
clerk=s record shows that a ANotice of Extraneous Offenses@ was filed on August 13, 2002, and the
reporter=s record shows that a copy of that notice was
Afaxed@ to appellant=s
attorney on that same date.[6]  The State gave notice, that during its
case-in-chief or during punishment, the following Acrimes, wrongs or acts@ may be introduced:

The defendant, Yesenia Hernandez, engaged in
a continuing course of criminal conduct with the Complainant, Roy Aguilera, a
child, in Dallas County, Texas between the dates of February 2000 until August
2001.  The conduct consisted of the
following:

 

 Striking and scratching the complainant=s torso, extremities, face, head, with the
defendant=s hand

 

 Pulling and twisting the complainant=s arms and legs causing fractures and severe
bruises

 

 Burning the complainant=s neck, back, chest, shoulders, feet, hands,
and arms with a clothes iron

 

 Striking the complainant with and against a
broom stick, toys, wall, floor, any unknown object causing severe head injury

 

 Shaking the complainant with defendant=s hands causing fractured ribs and head
trauma

 

 Malnourishment of the complainant by failing
to feed the complainant and seek proper medical attention and the defendant had
a legal duty to do so

 

 Choking the complainant=s neck with her hands

 

 Biting the complainant=s buttocks, arms, fingernails with the
defendant=s teeth

 








The notice
which the State gave to appellant=s attorney was Areasonable notice@ in advance of trial under TEX.R.EVID. 404(b).  See also TEX. CODE CRIM. PRO. ANN. art.
37.07, ' 3(g) and 
art. 38.37 (Vernon Supp. 2003 & Pamph. Supp. 2003).  Point of Error No. 8 is overruled.

                                                                This
Court=s Ruling

The
judgment of the trial court is affirmed.         

 

BOB
DICKENSON

SENIOR
JUSTICE

 

August 29, 2003

Publish.  See TEX.R.APP.P. 47.2(b).

Panel consists of:  Wright, J., and

McCall, J., and Dickenson, S.J.[7]
          











[1]See TEX. PENAL CODE ANN. '
19.03 (Vernon 2003).  The offense was Acapital murder@
because the victim was under six years of age.





[2]See TEX. PENAL CODE ANN. '
12.31 (Vernon 2003).





[3]See Miranda v. Arizona, 384 U.S. 436 (1966).





[4]There were 65 autopsy photographs, and 39 of them were
admitted into evidence.





[5]See Footnote No. 4 which notes that 26 of the autopsy
photographs were not admitted into evidence.





[6]The voir dire of the jury panel began seven days later.





[7]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.