In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00018-CR


______________________________




TREVOR ERAN DUNCAN, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 89th Judicial District Court


Wichita County, Texas


Trial Court No. 38,647-C




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Moseley



MEMORANDUM OPINION



 Pursuant to a plea bargain agreement entered August 28, 2003,Trevor Eran Duncan entered
his plea of guilty to five separate counts of indecency with a child. (1) See Tex. Penal Code Ann.
§ 21.11(a)(1) (Vernon 2003). Under that agreement, Duncan was placed on deferred adjudication
community supervision for five years and a $1,000.00 fine for each of the five counts. In April 2005,
a motion to proceed to adjudication of guilt was filed, alleging multiple violations by Duncan of his
terms of community supervision; amended motions were filed, the last of which being filed in
August 2006. 

 Duncan's attorney, Dean Sanders, arranged a plea bargain agreement wherein two of the five
counts of indecency with a child would be dismissed and Duncan would receive an eight-year
sentence on each of the other three counts, these to be served concurrently. Under that agreement,
on October 26, 2006, Duncan entered a plea of "true" to having violated the terms of his community
supervision, with the required admonitions and determinations being made at that time. Imposition
of sentence was delayed until November 9, 2006.

 Between the entry of his plea of true and the date of sentencing, Duncan entertained second
thoughts about the wisdom of the plea bargain agreement. Against the advice of Sanders, Duncan
repudiated the plea bargain agreement but decided to allow the trial court to determine punishment
under an open plea. No evidence was presented by either Duncan or the State, and the trial court
found Duncan guilty of all five counts and assessed the punishment at eight years' confinement on
each; the first three counts were to be served consecutively and the final two counts were to run
concurrently with the first sentence. 

 Duncan has appealed, claiming ineffective assistance of counsel and disproportionate
sentencing.

CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

 Although Duncan's brief breaks down his complaints regarding the effectiveness of his
representation by counsel into very particularized (and sometimes redundant) elements, the overall
thrust of these claims revolves around the actions of his attorney, Sanders, in: (1) neither having
called witnesses nor having made arguments to the trial court to urge a resumption of the community
supervision under which Duncan had been previously serving, (2) not calling such witnesses or
making an argument to the trial court for a lesser sentence than the agreed-upon eight-year sentence
or other evidence in mitigation of the sentence, (3) not calling into question Duncan's emotional and
mental status of being unable to withstand the demands of Duncan's wife that he disavow the plea
bargain agreement, (4) not having requested a continuance upon learning of Duncan's desire to
disavow the plea agreement, and (5) not having objected to the alleged disproportionality of the
sentence imposed on Duncan after its announcement by the trial judge.

 The standard of testing claims of ineffective assistance of counsel is set out in Strickland v.
Washington, 466 U.S. 668 (1984), and adopted for Texas constitutional claims in Hernandez v. State,
726 S.W.2d 53, 57 (Tex. Crim. App. 1986). To prevail on this claim, an appellant must prove by
a preponderance of the evidence (1) that his counsel's representation fell below an objective standard
of reasonableness and (2) that the deficient performance prejudiced his defense. Strickland, 466 U.S.
at 689; Rosales v. State, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999). To meet this burden, the
appellant must prove that his attorney's representation fell below the standard of prevailing
professional norms and that there is a reasonable probability that, but for his attorney's deficiency,
the result would have been different. Tong v. State, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). 
Under this standard, a claimant must prove that counsel's representation so undermined the proper
functioning of the adversarial process that the trial cannot be relied on as having produced a just
result. Strickland, 466 U.S. at 686. In other words, if counsel's performance fell below the objective
standard, the reviewing court then must determine whether there is a "reasonable probability" the
result of the trial would have been different but for counsel's deficient performance. See id. at 693. 
A reasonable probability is a "probability sufficient to undermine confidence in the outcome." See
id. at 694; see also Ex parte Menchaca, 854 S.W.2d 128, 131 (Tex. Crim. App. 1993); Boyd v. State,
811 S.W.2d 105, 109 (Tex. Crim. App. 1991).

 Our review of counsel's representation is highly deferential, and we indulge a strong
presumption that counsel's conduct falls within a wide range of reasonable representation. 
Strickland, 466 U.S. at 689; Tong, 25 S.W.3d at 712. This Court will not second-guess through
hindsight the strategy of counsel at trial, nor will the fact that another attorney might have pursued
a different course support a finding of ineffectiveness. Blott v. State, 588 S.W.2d 588, 592 (Tex.
Crim. App. 1979). That another attorney, including appellant's counsel on appeal, might have
pursued a different course of action does not necessarily indicate ineffective assistance. Harner v.
State, 997 S.W.2d 695, 704 (Tex. App.--Texarkana 1999, no pet.). Any allegation of
ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate
the alleged ineffectiveness. Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

 The testimonies of Duncan and Sanders differ fairly radically regarding the understanding
which each had of Duncan's actions in rejecting the plea bargain agreement and the roles which each
played in that scenario. Apparently, there had been an ongoing exchange between the two in the
two-week period between the entry of the plea of true and the date of sentencing as to the
acceptability of the plea bargain agreement. Duncan was apparently receiving pressure from his wife
to reject the plea bargain agreement. There is some evidence that his wife had represented to Duncan
that someone (who was either known by her or was known by someone she knew) had been in
contact with someone familiar with the trial judge who had represented that it was quite likely that
the judge would be willing to reinstate Duncan to his community supervision status if Duncan
repudiated the plea bargain agreement which had been previously made. (2) 

 It is plain that Sanders was frustrated with Duncan's change of heart and sudden recalcitrance,
Sanders having been made aware of and informing Duncan that the trial judge had refused the
previously agreed-to plea bargain of five years' confinement on three counts, all of which would run
concurrently. Although Sanders believed that Duncan was accepting poor advice from his wife in
disavowing his plea bargain agreement, he did not believe Duncan to be incapable of effectively
opting for the course of action he took--rather, he was just totally unwise in the choice he had made.

 On the day of sentencing, Sanders requested time to talk with Duncan; they retired to the jury
room and, upon returning to the courtroom, Sanders announced that Duncan needed to be sworn and
to testify. Under questions proposed by Sanders, Duncan related that he chose to repudiate the plea
agreement into which he had previously entered, that he understood that after repudiating the plea
agreement, he could request the court to allow him to withdraw his plea of true and if the trial court
allowed him to withdraw his plea of true that another hearing could be held "where we would put
on evidence" relating to the matter, but that the State would not be restricted to only the violations
to which Duncan had pled true but could have the opportunity to prove up the other violations, that
Duncan's right to appeal would be extremely limited, and that it was still not too late to honor the
plea bargain agreement if he chose to do so. Following this litany, Duncan requested the opportunity
to once again visit with his family and Sanders concerning his course of action. The trial court
granted the request and the hearing was recessed. Upon resumption of the hearing, Duncan reiterated
his desire to repudiate the plea bargain agreement and enter an open plea to the trial court. 

 Although their stories as related at the hearing on the motion for new trial vary widely as to
the advice that was given by Sanders to Duncan, it appears undisputed that when Sanders first
appeared in court with Duncan, he was unaware that Duncan (somehow convinced by others that he
would receive leniency from the trial court and would be reinstated on community supervision) had
finally determined to repudiate the plea bargain agreement. 

 Duncan now claims that he had witnesses ready and willing to testify in an effort to mitigate
the sentences. Potential witnesses testified at the motion for new trial.

 One of the witnesses was Duncan's mother, Onabeth Boswell, who indicated that she was
present at the sentencing hearing and that she was aware that there was a possibility that she might
be called as a witness at that time. She indicated that had she been called, she would have testified
"positively" for her son. 

 Another witness was Martha Sabo, who identified herself as a friend of Boswell from the
time they were both eleven years old and who had known Duncan since he was a baby. Sabo
testified that she was retired from the Department of Health and Human Services of the State of
Florida, where she had worked in a specialized unit which dealt with abused children. (3) She had
prepared a report she wanted to present to the trial court in which she concluded that Duncan 
"presents no danger to any children, has a stable family, and works for the same employer for whom
he has worked for several years." 

 Duncan proffered the testimony of Peggy Thomas, Boswell's best friend for many years. 
Thomas said that had she been called as a witness, she would have had "positive" things to say about
Duncan. She did admit that she had never had the opportunity to visit an adult book store (one of
the places Duncan was alleged to have gone in violation of the terms of his community supervision);
therefore, she would have had no opportunity to observe Duncan there.

 Finally, during Duncan's testimony, he testified generally that although he had done things
which were technical violations of some of the terms of his community supervision, those violations
were one-time affairs of minor or inadvertent occasion, none of which (he believed) justified the
revocation of his community supervision. He could also have provided some of the reasoning which
prompted his insistence on the withdrawal of his plea bargain agreement. 

 Overall, Duncan complains that Sanders provided ineffective counsel in neither presenting
arguments nor evidence to diminish the impact of the plea of true to the violations of the terms of
community supervision or to have requested a continuance to be able to provide some kind of
defense. Although there were references to other potential witnesses (the content of their possible
testimony not having been developed by Duncan) during the motion for new trial, other than these
witnesses, there was no proffer of testimony of earth-shaking dimensions and none of the evidence
was particularly persuasive. Although Duncan now asserts that the failure to call these witnesses or
others was an example of ineffective assistance of counsel, absent a showing that witnesses were
available whose testimony would have helped the defense, a claim of ineffective assistance of
counsel cannot be sustained on that basis. Wilkerson v. State, 726 S.W.2d 542, 551 (Tex. Crim. App.
1986). We conclude that Duncan has not shown the existence of witnesses whose testimony would
have had any substantial impact on the outcome of the trial. Some weeks intervened between the
date Duncan was sentenced and the date of the hearing on the motion for new trial; one would
presume that if the new counsel representing Duncan at the hearing on the motion for new trial had
been able to locate persuasive witnesses whose testimony would have made a difference in the
outcome, those witnesses would have testified at that later hearing. If there were no witnesses who
could be called to change the outcome, then a motion by Sanders for a continuance would have borne
no fruit for Duncan. 

 It is further alleged by Duncan that Sanders was ineffective for not having lodged an
objection to the alleged disproportionality of the sentence at the time it was announced by the judge. 
Sanders characterized this as being the "epitome of pointlessness" at the hearing on the motion for
new trial. Sanders had been practicing criminal law for many years; he was familiar with the courts
in Wichita County. From the standpoint of convincing the sentencing judge to lower the sentence,
such an objection may well have been deemed by Sanders to have been pointless. However, that is
not the sole reason for lodging such an objection; preservation of error is another. Such an objection,
if timely lodged, can preserve error. However, this is not the sole means by which such an error can
be preserved; the filing and prosecution of a proper motion for new trial can serve the same purpose.
Williamson v. State, 175 S.W.3d 522, 523-24 (Tex. App.--Texarkana 2005, no pet.). That having
been attempted by other counsel, any error of the trial court in imposing cruel and unusual
punishment or in disproportionate sentencing has been preserved as fully as if there were an
objection at the time of sentencing and Duncan has suffered no harm. 

 Rule 1.02 of the Texas Rules of Professional Conduct prescribes that an attorney "shall abide
by a client's decisions." Tex. Disciplinary R. Prof'l Conduct 1.02, reprinted in Tex. Gov't
Code Ann. tit. 2, subtit. G app. A (Vernon 2005) (Tex. State Bar R. art. X, § 9). From all of the
rather extensive evidence presented at the hearing on the motion for new trial, it appears that Duncan
chose his own course of action--against the advice of Sanders. Now, facing the consequences of
his failure to follow the advice of counsel, Duncan is attempting to place the onus for those decisions
on his attorney. Duncan has failed to show that Sanders provided ineffective assistance of counsel
at trial. 

 We overrule this point of appeal.

DISPROPORTIONATE SENTENCING

 On appeal, Duncan contends the sentence imposed by the trial court was disproportionate to
the offense, citing Solem v. Helm, 463 U.S. 277 (1983).

 Texas courts have traditionally held that as long as the punishment assessed is within the
range prescribed by the Legislature in a valid statute, the punishment is not excessive, cruel, or
unusual. See, e.g., Jordan v. State, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973). Here, Duncan's
sentence falls within the applicable range of two years to ten years. See Tex. Penal Code Ann.
§ 12.34 (Vernon 2003); when there are multiple charges arising out of the same incident, the
sentences can be made to run consecutively. See Tex. Penal Code Ann. § 3.03(b)(2)(A) (Vernon
Supp. 2006).

 That does not end the inquiry. A prohibition against grossly disproportionate punishment
survives under the Eighth Amendment to the United States Constitution apart from any consideration
of whether the punishment assessed is within the range established by the Legislature. U.S. Const.
amend. VIII; see Solem, 463 U.S. at 290; Harmelin v. Michigan, 501 U.S. 957 (1991) (Scalia, J.,
plurality op.); Jackson v. State, 989 S.W.2d 842, 845 (Tex. App.--Texarkana 1999, no pet.); Lackey
v. State, 881 S.W.2d 418, 420-21 (Tex. App.--Dallas 1994, pet. ref'd); see also Ex parte Chavez,
213 S.W.3d 320, 323-24 (Tex. Crim. App. 2006) (describing this principle involving a "very limited,
'exceedingly rare,' and somewhat amorphous" review). 

 Solem had suggested, as a three-part test, that an appellate court consider: (1) the gravity of
the offense compared with the harshness of the penalty; (2) the sentences imposed for similar crimes 
in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other
jurisdictions. See Solem, 463 U.S. at 292. Harmelin at least raised questions about the viability of
the Solem three-part test. In fact, it was subsequently held that proportionality survived Harmelin,
but that the Solem three-part test did not. See McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir.
1992); Lackey, 881 S.W.2d at 420-21. In light of Harmelin, the test has been reformulated as an
initial threshold comparison of the gravity of the offense with the severity of the sentence, and then,
only if that initial comparison created an inference that the sentence was grossly disproportionate to
the offense should there be a consideration of the other two Solem factors--(1) sentences for similar
crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions. 
McGruder, 954 F.2d at 316; Mullins v. State, 208 S.W.3d 469, 470 (Tex. App.--Texarkana 2006,
no pet.); Lackey, 881 S.W.2d at 420-21.

 As a prerequisite to presenting a complaint for appellate review, the record must show that
the complaint was made to the trial court and that the trial court either ruled or refused to rule on that
complaint. Tex. R. App. P. 33.1(a). The complaint must be sufficiently specific to make the trial
court aware of the grounds of the complaint. Tucker v. State, 990 S.W.2d 261, 262 (Tex. Crim. App.
1999). 

 Duncan did file a motion for new trial. In that motion, he did call to the attention of the court
that he challenged the proportionality of the sentence received by him, specifically alleging that the
statutory scheme which permits a violation of Section 21.11(a)(1) of the Texas Penal Code (i.e., a
case of indecent exposure wherein the victim is a child less than seventeen years of age) to be made
to run consecutively pursuant to Section 3.03(b)(2)(A) of the Texas Penal Code, creates a violation
of the prohibition against cruel and unusual punishment as proscribed by the Eighth Amendment of
the United States Constitution and also barred by Article 1, Section 13 of the Texas Constitution. 
He claims the penalty which he was assessed is grossly disproportionate to the conduct which
precipitated the charge.

 The maximum sentence which could have been imposed on Duncan for having exposed
himself to five children less than seventeen years of age could have been as much as fifty years'
confinement (i.e., five counts times ten years--to run consecutively). Duncan received a sentence
of twenty-four years' imprisonment (three sentences of eight years, each to run consecutively, and
two sentences of eight years to run concurrently with the first sentence). Therefore, the sentence
received by Duncan--less than half of its potential--was well within the statutory parameters. 
However, Duncan's complaint is that the statutory scheme itself which allows such a sentence (and
its application to Duncan) is the combination which permits disproportionate sentencing.

 In an effort to comply with the second and third prongs of the tests in Solem and Harmelin,
Duncan has harvested and provided us with what he represents to be the statutes of each of our forty-nine sister states which would be the equivalents or rough equivalents of Texas' indecent exposure
statute involving juveniles as victims. See Tex. Penal Code Ann. § 21.11(a)(1). It is pointed out
in Duncan's brief that only Florida (15 years), Louisiana (25 years), and Oklahoma (20 years) have
statutes which impose penalties which are more severe than Texas. It is difficult to determine from
that which was provided and without extremely extensive research to determine the impact which
the ability to "stack" sentences would have on the potential penalty range of those states, or even if
any such ability exists in the many other jurisdictions. (4) However, the range of statutory penalties of
the various states is not one of the measures under the three-pronged test mentioned in Solem and
Harmelin; the test, rather, is the range of sentences which are assessed. Except for the ability to
extrapolate what might potentially be assessed under the various statutes, no proof of the sentences
has been provided.

 Duncan cites one unreported case from the Dallas court of appeals for the proposition that
his sentence exceeds sentences for similar crimes within the State of Texas, (Barrientos v. State,
Nos. 05-06-00675-CR & 05-06-00676-CR, 2007 Tex. App. LEXIS 3945 (Tex. App.--Dallas
May 23, 2007, no pet. h.), in which the defendant received a sentence of only four years for a similar
crime. The adage is, "One snowflake does not a winter make." Likewise, one case does not
demonstrate the sentences imposed for similar crimes in the same jurisdiction; the case cited by
Duncan could be an isolated incident.

 Therefore, Duncan has failed to meet the burden of showing that he was imposed a
disproportionate sentence. (5)

 This Court observes that most often, claims of disproportionate sentencing see the first light
of day in the briefs filed in the courts of appeals, the point never having been raised at the trial court
level. When this claim has not been presented to the trial court, the trial court has had no opportunity
to examine its ruling in light of the claim of disproportionality. Therefore, when an alleged error has
not been the subject of an objection of some sort, the complainant has seldom preserved any error
for an appellate court to review. 

 Duncan has taken a further step than most and has, at least, filed a motion for new trial in
which the motion itself raises the issue of disproportionate sentencing. However, at the hearing on
that motion, Duncan made no mention of this issue and presented no evidence which would go
toward satisfaction of the tests which must be met under Solem and Harmelin. The trial court did
not have even the benefit provided this Court (i.e., the extensive list of statutes from across the
nation) to aid it in ruling on this issue once it was raised. A motion for new trial is but a pleading
and the allegations therein do not prove themselves, but must be proved. Zaragosa v. State, 588
S.W.2d 322 (Tex. Crim. App. [Panel Op.] 1979); Mackey v. State, 480 S.W.2d 720 (Tex. Crim. App.
1972). The burden of proof is on the movant in a motion for new trial. No proof was provided to
the trial court.

 The requirement that the trial court be given an opportunity to rectify any error committed
is an old one. See White v. State, 70 Tex. Crim. 285, 157 S.W. 152 (1913). This kind of requirement
has been carried forward and is contained in Rule 33.1 of the Texas Rules of Appellate Procedure.
The trial court must be given the opportunity to rule on the issues and should be accorded the
opportunity to be informed. When the trial court has not been presented the evidence upon which
to rule, an appeals court is then placed in the position of having to assume the unwelcome role of the
Monday morning quarterback. Therefore, even had the burden been met at the appellate level to
show the imposition of a disproportionate sentence, this claim is not adequately presented for appeal. 
We reject the claim of disproportionate sentencing.

 We affirm the judgment.





 Bailey C. Moseley

 Justice


Date Submitted: October 16, 2007

Date Decided: October 30, 2007


Do Not Publish

1. Very little can be determined from the clerk's record alone regarding the event which 
occurred to precipitate the charges. However, from the briefs and the reporter's record, it appears
that Duncan exposed his genitals to a group of five eleven- and twelve-year-old children who were
in his house playing video games.
2. There was no evidence given that there was actually any ex parte communication by the trial
judge or with any person associated with the trial judge to any person.
3. The testimony at the hearing on the motion for new trial did not develop that Sabo's
testimony would be admissible under the three-part test set out in Vela v. State, 209 S.W.3d 128, 131
(Tex. Crim. App. 2006). Being expert in the treatment of abused children does not necessarily
equate to having the expertise to render an opinion about the propensities or proclivities of their
abusers.
4. The power to impose cumulative or successive sentences has its roots in common law. 21a
Am. Jur. 2d Criminal Law § 886 (1998). Therefore, that power might exist in some states, even
absent statutory authority.
5. There is an apparent trend of appellate courts to go outside the record for facts not in
evidence. See Judge Cathy Cochran, Surfing the Net for a "Brandeis Brief": The Internet and
Judicial Use of Legislative Facts, 70 Tex. B.J. 9. We choose not to do so in this case.